**Slip Op. 14- 5**

UNITED STATES COURT OF INTERNATIONAL TRADE

_____

MACCLENNY PRODUCTS,                    :

                        *Plaintiff*,    :

            v.                          :        Court No. 05-00484

UNITED STATES,                          :

                        *Defendant*.    :
_____

[Granting Defendant's Partial Motion to Dismiss for Lack of Jurisdiction; Granting Defendant's Partial Motion to Dismiss for Failure to State a Claim (or, alternatively, Motion for Judgment on the Pleadings or for Summary Judgment); Granting Defendant's Motion for Partial Summary Judgment as to Certain Entries Eligible for Duty-Free Liquidation Pursuant to U.S.-Caribbean Basin Trade Partnership Act; and Denying Defendant's and Plaintiff's Motions for Partial Summary Judgment as to Method of Appraisement]

Dated:  January 22, 2014

Jerry P. Siskin, Simons & Siskin, of South Amboy, New Jersey, argued for Plaintiff.  With him on the brief were Bernard J. Babb and Patrick C. Reed.  Of counsel on the brief was Philip Yale Simons.

Amy M. Rubin, Senior Trial Counsel, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, New York, argued for Defendant.  With her on the brief were Stuart F. Delery, Assistant Attorney General, Civil Division, and Barbara S. Williams, Attorney in Charge, International Trade Field Office.  Of counsel on the brief was Michael Heydrich, Office of the Assistant Chief Counsel, International Trade Litigation, Bureau of Customs and Border Protection, U.S. Department of Homeland Security, of New York, New York.

# OPINION

RIDGWAY, Judge:

In this action, plaintiff Macclenny Products challenges the decision of the United States

Customs Service[1] denying Macclenny's protests contesting the agency's liquidation of entries of

_____

[1]The U.S. Customs Service – formerly part of the U.S. Department of Treasury – is now part of the U.S. Department of Homeland Security, and is commonly known as U.S. Customs and Border

"men's suit-type jackets" imported from Nicaragua in 2000 and 2001.  *See generally* First Amended

Complaint ¶¶ 3, 6, 8.[2]

Macclenny raises two claims.  Macclenny first contends that Customs erred by appraising

the merchandise at issue for liquidation based on "transaction value," because – according to

Macclenny – the price of the goods was influenced by the relationship between the importer-buyer

and the foreign manufacturer-seller.  Macclenny asserts that the merchandise instead should have

been appraised on the basis of "deductive value."  First Amended Complaint ¶¶ 11-24.  In addition,

Macclenny alleges that, to the extent that the subject merchandise was imported on or after October

2, 2000, the merchandise is entitled to duty-free treatment under the United States-Caribbean Basin

Trade Partnership Act ("CBTPA"), which extends trade benefits to certain countries in the

Caribbean region.  *Id*. ¶¶ 25-29; 19 U.S.C. § 2703(b) (2000),[3] implemented in U.S. Note 7(b)(i), Ch.

98, Subch. II, Harmonized Tariff Schedule of the United States ("HTSUS") (2000).[4]

Also at issue in this action is the Government's counterclaim for additional duties.

Specifically, the Government contends that, assuming that Customs' use of transaction value is

sustained, certain costs that were not included in Customs' liquidation of the merchandise should

---

Protection.  *See* Bull v. United States, 479 F.3d 1365, 1368 n.1 (Fed. Cir. 2007).  The agency is referred to as "Customs" herein.

[2]Macclenny filed both public and confidential versions of its First Amended Complaint. However, only the public version is cited herein.

[3]All citations to federal statutes are to the 2000 edition of the United States Code.

[4]All citations to the HTSUS herein are to the 2000 edition, as modified (in relevant part) by implementation of the CBTPA.  The 2001 edition is identical to the 2000 edition, as modified, in all relevant respects.

be added to the transaction value, and Customs should be awarded additional duties based on those additional sums.  Answer and Counterclaim ¶¶ 30-33.

Now pending before the Court are the parties' dispositive cross-motions.[5]  With respect to Macclenny's CBTPA claim, the Government seeks dismissal for lack of subject matter jurisdiction as to all entries at issue other than those covered by Protest No. 1803-04-100056.  *See* Defendant's Memorandum in Support of Motion for Summary Judgment ("Def.'s Brief") at 2, 9, 11-13.[6]  With respect to Macclenny's CBTPA claim for those entries covered by Protest No. 1803-04-100056, the Government seeks dismissal for failure to state a claim upon which relief can be granted as to the four entries that were made prior to October 2, 2000, the effective date of the CBTPA for goods from Nicaragua – *i.e.*, Entry Nos. WJP-0002399-9, WJP-0002416-1, WJP-0002429-4, and WJP-0002440-1.  *See id.* at 2 & n.3, 9, 11-13.  As to the three entries covered by Protest No. 1803-04-100056 that were entered on or after October 2, 2000 (*i.e.*, Entry Nos. WJP-0002470-8, WJP-0002492-2, and WJP-0002507-7), the Government seeks summary judgment liquidating the entries duty-free.  *See id.* at 2 & n.3, 13, 29; Defendant's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment and Response to Plaintiff's Cross-Motion for Summary Judgment ("Def.'s Reply Brief") at 3 n.4, 20; [Defendant's] Supplemental Memorandum in Support of Defendant's Motion for Summary Judgment ("Def.'s Supp. Brief") at 10.

---

[5]Although Macclenny and the Government filed both public and confidential versions of their principal briefs, all citations herein are to the public versions.

[6]As discussed below, although the Government's submission is captioned solely as a Motion for Summary Judgment, the Government's briefs also seek dismissal of certain claims for lack of subject matter jurisdiction and dismissal of others for failure to state a claim upon which relief can be granted.

With respect to all other entries, the Government requests entry of summary judgment sustaining Customs' use of transaction value to appraise the merchandise, based on the "circumstances of the sale" test set forth in the valuation statute. Specifically, the Government argues that use of transaction value was appropriate because – according to the Government – the price of the merchandise was "settled in a manner consistent with the normal pricing practices of the industry," and thus was not influenced by the relationship between the importer-buyer and the foreign manufacturer-seller. 19 U.S.C. § 1401a(b)(2)(B); 19 C.F.R. § 152.103(l)(1)[7]; *see* Def.'s Brief at 9, 13-20, 26, 28, 29; Def.'s Reply Brief at 1-12, 16, 20; Def.'s Supp. Brief at 8-9, *passim*; Defendant's Reply to Plaintiff's Supplemental Brief ("Def.'s Supp. Reply Brief") at 1-8.

The Government also seeks entry of summary judgment on its counterclaim for additional duties. Assuming that summary judgment enters sustaining Customs' decision to appraise the merchandise on the basis of transaction value, the Government requests that the Court order reliquidation of the entries at issue to include in the appraised value a specific sum per unit for entries made in 2000 to reflect "Deferred Production Costs," and, in addition, "all amounts paid by BCG to or on behalf of KB in 2000 and 2001 that were not offset by payments by KB to BCG or goods shipped by KB to Macclenny/BCG in those years." Def.'s Brief at 29; *see also id.* at 9, 20-26; Def.'s Reply Brief at 12-15, 20-21; Def.'s Supp. Brief at 10.

In its cross-motion for summary judgment, Macclenny concurs in the Government's request that Entry Nos. WJP-0002470-8, WJP-0002492-2, and WJP-0002507-7 be liquidated duty-free

---

[7]All citations to federal regulations are to the 1999 edition of the Code of Federal Regulations, which is identical to the 2000 and 2001 editions in all relevant respects.

pursuant to the CBTPA.  *See* Plaintiff's Memorandum in Opposition to Defendant's Motion for

Summary Judgment and in Support of Plaintiff's Cross-Motion for Summary Judgment ("Pl.'s

Brief") at 2, 3 n.1, 12-13, 14, 16-17, 32-33.  In addition, Macclenny seeks summary judgment on

its claim that the balance of the entries at issue should have been appraised for liquidation based on

deductive value.  *See id*. at 2, 13-15, 17-25, 28-31, 32; Plaintiff's Reply to Defendant's Response

to Plaintiff's Cross-Motion for Summary Judgment ("Pl.'s Reply Brief") at 1-11, 17-18; Plaintiff's

Supplemental Brief ("Pl.'s Supp. Brief") at 1-10; Plaintiff's Reply to Defendant's Supplemental

Brief ("Pl.'s Supp. Reply Brief") at 1-4.

With the limitations discussed herein, jurisdiction over Macclenny's claims lies under 28

U.S.C. § 1581(a); and jurisdiction over the Government's counterclaim lies under 28 U.S.C. § 1583.

As discussed in greater detail below, the Government's motion to dismiss for lack of jurisdiction

Macclenny's CBTPA claim as to all entries other than those covered by Protest No. 1803-04-100056

must be granted.  The Government's motion seeking dismissal or denial of Macclenny's CBTPA

claim with respect to the four entries covered by Protest No. 1803-04-100056 which were made

before October 2, 2000 also must be granted.  As to the three specified entries that are subject to the

CBTPA (Entry Nos. WJP-0002470-8, WJP-0002492-2, and WJP-0002507-7), the Government's

motion for summary judgment must be granted.  However, both the Government's motion for

summary judgment concerning the proper method of appraisement of all remaining entries and

Macclenny's cross-motion for summary judgment on the same issue must be denied.

# I. <u>Background</u>

This action concerns 46 entries of men's suit-type jackets imported from Nicaragua in 2000/2001 and presents two basic issues:   (1) whether, as the Government contends, it was proper for Customs to appraise the merchandise based on its "transaction value," notwithstanding the relationship between Macclenny Products (the importer-buyer) and KB Manufacturing Company (the foreign manufacturer-seller); and (2) whether any of the merchandise was eligible for duty-free treatment under the United States-Caribbean Basin Trade Partnership Act, as Macclenny maintains.[8]

As the Court of Appeals has explained, "[i]mported merchandise must be appraised so that the final amount of duty to be paid on the merchandise can be fixed and entries of the merchandise can be liquidated." <u>VWP of America, Inc. v. United States,</u>175 F.3d 1327, 1330 (Fed. Cir. 1999) (citing 19 U.S.C. § 1500).  Customs is required to appraise imported merchandise in the manner specified in the valuation statute, 19 U.S.C. § 1401a.  *See* 19 U.S.C. § 1500(a).  The statute establishes "transaction value" as the primary method of valuation.  19 U.S.C. § 1401a(a)(1)(A); *see also* <u>VWP of America</u>, 175 F.3d at 1330, 1335.[9]

---

[8]The facts set forth in this section are drawn generally from the parties' Statements of Facts, as well as their briefs and related exhibits, including, in particular, the deposition and affidavit of Philip Looby, the Chief Operating Officer of Bayer Clothing Group, Inc. ("BCG"), of which Macclenny was a division.

[9]In addition to transaction value (the primary method of valuation), the statute also sets forth five secondary methods, which must be considered in order (with the proviso that an importer may request the reversal of deductive value and computed value at the time the entry summary is filed). The five secondary methods of valuation are: (1) the transaction value of identical merchandise, (2) the transaction value of similar merchandise, (3) deductive value, (4) computed value, and (5) the " [v]alue if other values cannot be determined or used" (as specified in 19 U.S.C. § 1401a(f)(1)). *See* 19 U.S.C. § 1401a(a).

As discussed in greater detail below, Macclenny contends that the merchandise at issue here

"Transaction value" is defined in relevant part as "the price actually paid . . . for the merchandise when sold for exportation to the United States," plus certain statutory additions.  19 U.S.C. § 1401a(b)(1); *see also* 19 U.S.C. § 1401a(b)(4)(A) (defining "price actually paid" as "the total payment . . . made . . . for imported merchandise by the buyer to . . . the seller," excluding international freight, insurance, and other C.I.F. charges).  The "price actually paid" is typically the price that is reflected on the invoice for the merchandise, which is included with the entry papers that an importer files with Customs.

Although transaction value is the primary method of valuing imported goods under the statute, the use of transaction value may be contraindicated where – as here – the buyer and the seller are "related."  *See* <u>VWP of America</u>, 175 F.3d at 1330-31; 19 U.S.C. § 1401a(b)(2)(B); *see also* 19 C.F.R. § 152.103(j)(1)(iv).  In such circumstances, the parties' transaction must be "closely scrutinize[d]" to ensure that the parties have not colluded to lower the invoice price in order to minimize import duties.  *See generally* <u>La Perla Fashions, Inc. v. United States</u>, 22 CIT 393, 395, 9 F. Supp. 2d 698, 700-01 (1998), *aff'd per curiam*, 185 F.3d 825 (Fed. Cir. 1999) (explaining that potential for related parties to manipulate invoice price in order to evade import duties "motivated Congress to enact protective legislation and to direct Customs to closely scrutinize related party

_____

should be appraised based on "deductive value."  *See* 19 U.S.C. § 1401a(d) (defining "deductive value").  Customs has explained:  "Basically, deductive value is the resale price in the United States after importation of the goods, with deductions for certain items.  Generally, the deductive value is calculated by starting with a unit price and making certain additions to and deductions from that price."  *See generally* What Every Member of the Trade Community Should Know About: Customs Value (U.S. Dep't of Homeland Security July 2006) at 14-15; *see also* Def.'s Brief at 2 (summarizing definition of "deductive value" as "resale prices to U.S. buyers less statutory deductions").

transfer pricing").[10]

Due to such concerns, the valuation statute precludes appraisement based on transaction value where the buyer and seller are "related," except in certain circumstances.  Specifically, the statute authorizes the use of transaction value even where the buyer and seller are related "if an examination of *the circumstances of the sale*. . . indicates that the relationship between such buyer and seller did not *influence the price* actually paid."  19 U.S.C. § 1401a(b)(2)(B) (emphases added); *see also* 19 C.F.R. § 152.103(j)(2)(i).  Alternatively, the statute authorizes the use of transaction value notwithstanding a relationship between the buyer and the seller "if the transaction value of the imported merchandise closely approximates – (i) the transaction value of identical merchandise, or of similar merchandise, in sales to unrelated buyers in the United States; or (ii) the deductive value or computed value for identical merchandise or similar merchandise."   19 U.S.C. § 1401a(b)(2)(B)(i)-(ii)[11]; *see also* 19 C.F.R. § 152.103(j)(2)(i)(A)-(B).

Customs regulations provide detailed guidance for use in applying the "circumstances of the sale" test to determine whether or not a relationship influenced price in a related party transaction.

---

[10]When a foreign party (such as KB here) sells merchandise to a related party in the United States (such as Macclenny/BCG), Customs and the Internal Revenue Service ("IRS") share – at least in theory – the same goal:   ascertaining the correct price that the U.S. importer should pay to the related foreign entity for that merchandise.  However, Customs and the IRS have different concerns.  Customs generally is concerned that the stated price may be artificially low, so as to minimize customs duties due on the imported merchandise.  In contrast, the IRS typically is concerned that the stated price may be artificially high, so that a lower portion of the profit generated by the sale of the final product will be taxable in the United States.

[11]The statute requires that "each value referred to in clause (i) or (ii) that is used for comparison [must] relate[] to merchandise that was exported to the United States at or about the same time as the imported merchandise."   19 U.S.C. § 1401a(b)(2)(B); *see also* 19 C.F.R. § 152.103(j)(2)(i)(C).

The Interpretative Notes to 19 C.F.R. § 152.103(l)(1) provide, in relevant part:

> (i) Interpretative note 1. . . . [Where Customs has doubts about the use of price "and is unable to accept the transaction value without further inquiry,"] . . . Customs will examine relevant aspects of the transaction, including the way in which the buyer and seller organize their commercial relations and *the way in which the price in question was arrived at* in order to determine whether the relationship influenced the price.

> (ii) Interpretative note 2. If it is shown that the buyer and seller, although related, buy from and sell to each other as if they were not related, this will demonstrate that the price has not been influenced by the relationship, and the transaction value will be accepted. *If the price has been settled in a manner consistent with the normal pricing practices of the industry in question*, or with the way the seller settles prices for sales to buyers who are not related to him, *this will demonstrate that the price has not been influenced by the relationship*.

> (iii) Interpretative note 3. If it is shown that the price is adequate to ensure recovery of all costs plus a profit which is equivalent to the firm's overall profit realized over a representative period of time (*e.g.*, on an annual basis), in sales of merchandise of the same class or kind, this would demonstrate that the price has not been influenced.

19 C.F.R. § 152.103(l)(1)(i)-(iii) (emphases added).

At the time of the events at issue, Macclenny was a division of Bayer Clothing Group, Inc. ("BCG"), with responsibility for BCG's import/export activities.[12] KB was established in Nicaragua in 1997 as a division of BCG, for the specific purpose of producing "cheap value wool" menswear. As both Macclenny and KB were divisions of BCG (which was wholly owned by Robert I. Bayer), it is undisputed that Macclenny and KB are related entities for purposes of the valuation statute. *See* 19 U.S.C. § 1401a(g)(1).

KB was the only manufacturer of men's suit-type jackets in Nicaragua (whether or not for

---

[12]Noting that "Macclenny did not maintain separate accounting records from BCG and always acted on BCG's behalf," the Government's briefs generally refer to Macclenny and BCG jointly, as "Macclenny/BCG." *See* Def.'s Brief at 4 n.5. The same convention is followed here.

export to the United States); and KB had no customers other than Macclenny/BCG.  KB thus existed

solely to serve Macclenny/BCG.  Macclenny/BCG shipped cut raw materials to KB in Nicaragua,

where KB assembled them into ready-to-wear suit-type jackets.  KB returned the assembled

garments directly back to Macclenny/BCG in the United States.  Macclenny/BCG then sold the

jackets to its U.S. customers, including retailers such as Sears and JCPenney.

The prices for KB's sales to Macclenny/BCG were not set by KB.  Instead, the prices were

set by Philip Looby, BCG's Chief Operating Officer at the time, who based them on annual budgets

prepared by several individuals including BCG's Vice President of Manufacturing and KB's Plant

Manager.[13]  Although KB was not expected to earn a profit during the start-up phase, it was expected

– when operations began in 1998 – that the KB would turn a reasonable profit within a few years.

Yet, from the time KB commenced production in 1998 until it ceased operations in 2007, no profit

ever materialized.  Indeed, KB operated at a loss for every year of its existence.

Mr. Looby nevertheless raised the prices that Macclenny/BCG paid KB only twice over the

course of KB's lifetime – once sometime after July 1999 but before the merchandise at issue was

imported in 2000/2001, and then once again in 2005.  Moreover, despite KB's record of sustained

losses, KB was not free to decline any order from Macclenny/BCG.  Nor was price ever open to any

offer/counter-offer process, or any other form of negotiation between KB and Macclenny/BCG.  KB

was required to fulfill every order placed by Macclenny/BCG, and to do so at the price that was set

by Mr. Looby, the Chief Operating Officer of BCG.

In this respect, Macclenny/BCG's dealings with KB differed from Macclenny/BCG's

---

[13]On at least one occasion, Mr. Looby also consulted with the Chief Financial Officer of
BCG.

dealings with X-Cell (a Dominican garment assembly contractor) and other similar contractors to which Macclenny/BCG was not related.  Thus, for example, when Macclenny/BCG told X-Cell the price that Macclenny/BCG was willing to pay for a particular style of jacket, X-Cell decided whether or not to agree to produce the goods after determining whether it could expect to turn a profit on the business.  Unlike KB, X-Cell and Macclenny/BCG's other contractors were free to reject orders from the company, if, for example, a price offered by Macclenny/BCG was too low.

Finally, some of the KB merchandise at issue was imported after early October 2000, when KB's home country – Nicaragua – was granted beneficiary status under the United States-Caribbean Basin Trade Partnership Act ("CBTPA").  *See* 19 U.S.C. § 2702(b) (listing Nicaragua as eligible for designation as beneficiary country under Act, effective Oct. 2, 2000); Determination under the Caribbean Basin Act, 65 Fed. Reg. 60,236 (Oct. 10, 2000) (granting Nicaragua beneficiary status, and modifying HTSUS, effective Oct. 2, 2000).  Under the Act, eligible goods from "beneficiary countries" such as Nicaragua may be imported into the United States duty-free.  *See generally* 19 U.S.C. §§ 2702-03 (listing certain countries and goods as eligible for duty-free treatment under Act).  In particular, the merchandise eligible for such duty-free treatment includes "apparel articles" that were assembled in a CBTPA beneficiary country "from fabrics wholly formed and cut in the United States" and were then imported directly into the United States under subheading 9802.00.80 of the HTSUS[14] – the tariff classification for the merchandise at issue here, which is not in dispute.  *See*

---

[14]HTSUS subheading 9802.00.80 covers "[a]rticles . . . assembled abroad in whole or in part of fabricated components, the product of the United States, which (a) were exported in condition ready for assembly without further fabrication, (b) have not lost their physical identity in such articles by change in form, shape or otherwise, and (c) have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating and painting."  Subheading 9802.00.80, HTSUS.

19 U.S.C. § 2703(b)(2)(A)(i)(I); U.S. Note 7(b)(i), Ch. 98, Subch. II, HTSUS; *see also* Proclamation 7351 of October 2, 2000 to Implement the United States-Caribbean Basin Trade Partnership Act, Fed. Reg. 59,329, 59,333 (Oct. 4, 2000) (modifying HTSUS to include U.S. Note 7(b)(i), Ch. 98, Subch. II, HTSUS, effective Oct. 2, 2000).

Pursuant to a request from Macclenny, Customs suspended liquidation of the merchandise at issue pending the resolution of various valuation-related issues, including – in particular – Macclenny's claim that Customs' use of "transaction value" to appraise the goods would be inappropriate because (according to Macclenny) the relationship between KB and Macclenny/BCG had influenced the price. Macclenny argued that, under the circumstances, the merchandise should be appraised based on "deductive value."[15]

Customs reviewed supplemental information and worksheets submitted by Macclenny, then requested internal advice from Customs Headquarters. Relying on a September 2001 letter to Customs in which Macclenny's counsel had stated that, "[f]or the 1999 year," prices for KB's merchandise had been established "after arms' length negotiations" with BCG, Customs Headquarters concluded – based on the "circumstances of the sale" test – that the relationship between KB and Macclenny/BCG had no "influence" on prices. Customs Headquarters therefore

---

[15]In addition to suspending liquidation of the 2000 and 2001 entries, Customs also suspended liquidation of entries made in 1999 (which are not at issue in this action). Customs expressed reservations about the adequacy of Macclenny/BCG's documentation and seeming errors in the company's deductive value spreadsheets. Nonetheless, the agency ultimately acquiesced to the company's claim with respect to the 1999 entries and appraised them based on deductive value, citing a shortage of Customs port personnel to conduct a verification. However, Customs expressly cautioned Macclenny/BCG at the time that claims for subsequent years would be reviewed and processed based on their substantive merits. *See generally* Def.'s Brief at 2; Def.'s Reply Brief at 2 n.3.

advised that the proper basis for appraisement was transaction value plus additions. *See* HQ 548475 (March 25, 2004) (Def.'s Brief, Exh. M).  Accordingly, at liquidation, Customs appraised the merchandise on the basis of transaction value at the unit values as entered, including an amount for the values of U.S. components.  Duties were assessed at the various rates derived from the applicable subheadings in HTSUS Chapter 62.  *See generally* Subheading 9802.00.80, HTSUS.

Thereafter, Macclenny filed four protests, reiterating its claim for appraisement based on deductive value, and, in one of the protests, asserting a claim for duty-free treatment under the CBTPA.  Customs denied Macclenny's protests, and this action ensued.

## II.  Standard of Review

With respect to Macclenny's claims to duty-free treatment under the United States-Caribbean Basin Trade Partnership Act ("CBTPA"), the Government seeks dismissal for lack of subject matter jurisdiction as to the majority of the entries at issue. *See generally* section III.A.1.a, *infra*; USCIT R. 12(b)(1).  The existence of subject matter jurisdiction is a threshold inquiry.  *See*, *e.g.*, Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 94-95 (1998).  Where subject matter jurisdiction is challenged, the party invoking jurisdiction bears the burden of proving its existence.  Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011); *see also* McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189 (1936); Norsk Hydro Canada, Inc. v. United States, 472 F.3d 1347, 1355 (Fed. Cir. 2006).

Moreover, it is axiomatic that "'[t]he United States, as sovereign, is immune from suit save as it consents to be sued . . . , and [that] the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'"  United States v. Mitchell, 445 U.S. 535, 538 (1980)

(quoting <u>United States v. Sherwood</u>, 312 U.S. 584, 586 (1941)); *see also* <u>Blueport Co. v. United States</u>, 533 F.3d 1374, 1378 (Fed. Cir. 2008); <u>Georgetown Steel Corp. v. United States</u>, 801 F.2d 1308, 1312 (Fed. Cir. 1986).  Thus, where – as here – a waiver of sovereign immunity is at issue, the language of the statute must be strictly construed, and any ambiguities resolved in favor of immunity.  <u>FAA v. Cooper</u>, ____ U.S. ____, ____, 132 S. Ct. 1441, 1448 (2012) (citing <u>United States v. Williams</u>, 514 U.S. 527, 531 (1995)); <u>Zoltek Corp. v. United States</u>, 672 F.3d 1309, 1318 (Fed. Cir. 2012); <u>Hartog Foods Int'l, Inc. v. United States</u>, 291 F.3d 789, 791 (Fed. Cir. 2002).

With respect to Macclenny's CBTPA claim concerning the four entries covered by Protest No. 1803-04-100056 that were made prior to October 2, 2000 (the effective date of the CBTPA as to goods from Nicaragua), the Government moves to dismiss for failure to state a claim upon which relief can be granted.  *See generally* section III.A.1.b, *infra*; USCIT R. 12(b)(5).  On such a motion, the movant has the burden of demonstrating that no claim has been stated.  *See generally* 5B C. Wright & A. Miller, Federal Practice and Procedure § 1357, pp. 456-62 (3d ed. 2004) ("Wright & Miller").  Further, the court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff."  <u>In re Bill of Lading Transmission and Processing System Patent Litigation</u>, 681 F.3d 1323, 1331 (Fed. Cir. 2012); *see also* <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009); <u>Amoco Oil Co. v. United States</u>, 234 F.3d 1374, 1376 (Fed. Cir. 2000).[16]  Thus, the purpose of a motion to dismiss for failure to state a claim is not to "resolv[e] a contest between the parties about the facts or the substantive merits of

---

[16]On the other hand, a complaint's "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to satisfy the requirements of the Federal Rules.  <u>Ashcroft v. Iqbal</u>, 556 U.S. at 678.  Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Id*.

the [non-movant's] case." 5B Wright & Miller § 1356, p. 354. However, it does serve to "test the

formal sufficiency of the statement of the claim for relief," challenging "the legal theory of the

complaint." *Id*.; <u>Advanced Cardiovascular Systems, Inc. v. Scimed Life Systems, Inc.</u>, 988 F.2d

1157, 1160 (Fed. Cir. 1993) (explaining that motion to dismiss for failure to state claim is designed

"to allow the court to eliminate actions that are fatally flawed in their legal premises and destined

to fail"). As such, "only a complaint that states a plausible claim for relief survives [such] a motion

to dismiss." <u>Ashcroft v. Iqbal</u>, 556 U.S. at 679.[17]

Finally, both parties seek summary judgment on certain claims. *See generally* section

III.A.1.c, *infra* (addressing Government's motion for summary judgment as to certain entries entitled

to duty-free treatment under CBTPA); section III.A.2, *infra* (addressing Government's motion for

summary judgment concerning proper method of appraisement); section III.B, *infra* (addressing

Macclenny's cross-motion concerning same ); USCIT R. 56.[18]  Summary judgment is a favored

---

[17]There is ample authority for the proposition that a motion to dismiss for failure to state a claim must be filed before the service of a responsive pleading; otherwise, it must be treated through some other vehicle, such as a motion for judgment on the pleadings or a motion for summary judgment. *See* USCIT R. 12(b) (stating that "a motion asserting any of the[] defenses [listed in Rule 12(b)] must be made before pleading if a responsive pleading is allowed"); <u>Advanced Cardiovascular Systems</u>, 988 F.2d at 1160 (noting that Federal Rules authorize defendant to file motion to dismiss "before filing a responsive pleading"); 5B Wright & Miller § 1357, p. 408. Under the circumstances of this case, however, it makes no difference whether the specific claims at issue are analyzed through the lens of a motion to dismiss for failure to state a claim or a motion for summary judgment. The outcome is the same either way.

[18]The Government suggests that the "presumption of correctness" attaches to Customs' decision to use transaction value to appraise the subject merchandise. *See* Def.'s Brief at 10 (quoting <u>VWP of America</u>, 175 F.3d at 1342 (noting that a "presumption of correctness attaches to every *factual determination* necessary to support an appraisal") (emphasis added)). However, the statutory presumption of correctness that Customs' decisions enjoy under 28 U.S.C. § 2639(a)(1) has no force or effect at the summary judgment stage of proceedings, because summary judgment may be entered only if there is no genuine dispute as to any material fact – and, if there is no such

procedural device "to secure the just, speedy and inexpensive determination of [an] action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1); *see also* Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1562 (Fed. Cir. 1987).  Indeed, the Court of Appeals has hailed summary judgment as a "salutary procedure . . . to avoid unnecessary expense to the parties and wasteful utilization of the jury process and judicial resources."   Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd., 731 F2d 831, 835 (Fed. Cir. 1984).

Nevertheless, under USCIT Rule 56, summary judgment is appropriate only when the record evidence – "including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, [and] other materials" – establishes that "there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law."  USCIT R. 56(a) & (c)(1)(A); *see also* Celotex, 477 U.S. at 322-23; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  In addition, where a motion for summary judgment is filed and properly supported, an adverse party may not rest upon mere denials to defeat it.  To the contrary, the opposing party must "cit[e] to particular parts of materials in the record" to establish the "presence of a genuine dispute" warranting trial.  USCIT R. 56(c).  And, if a party "fails to properly address another party's assertion of fact," that assertion of fact may be

_____

factual dispute, then Customs does not need the benefit of any presumption.  *See, e.g.,* Universal Electronics, Inc. v. United States, 112 F.3d 488, 492-93 (Fed. Cir. 1997) (explaining that statutory presumption of correctness "carries no force as to questions of law"); Rollerblade, Inc. v. United States, 112 F.3d 481, 483-84 (Fed. Cir. 1997) (stating that presumption of correctness "is irrelevant where there is no factual dispute between the parties"); Goodman Mfg., L.P. v. United States, 69 F.3d 505, 508 (Fed. Cir. 1995) (noting that, absent factual dispute between parties, "the presumption of correctness is not relevant").  Indeed, the Court of Appeals decision on which the Government relies – VWP of America – did not involve appellate review of a decision on summary judgment. VWP had gone to trial.  *See* VWP of America, 175 F.3d at 1332 (noting that decision of Court of International Trade under review was rendered "[f]ollowing a trial").

deemed "undisputed for purposes of the motion." USCIT R. 56(e)(2).[19]

Ultimately, the function of the judge at the summary judgment stage "is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, 477 U.S. at 249. The question, then, "is not whether [a party's] proof will ultimately be found convincing or persuasive . . . . Rather, the question is only whether the parties have proof for their claims . . . such that a trial is needed." 11 Moore's Federal Practice § 56.02[1], p. 56-18 (3d ed. 2013) ("Moore's Federal Practice"). As such, a movant is not entitled to summary judgment "merely because the facts the party offers appear more plausible than those tendered in opposition, or because it appears that the adversary is unlikely to prevail at trial. This is true even though both parties move for summary judgment" – as the parties have done here. 10A C. Wright, A. Miller, & M. K. Kane, Federal Practice and Procedure § 2725, pp. 432-33 (3d ed. 1998) ("Wright, Miller, & Kane"). Summary judgment is proper "only when a trial would be superfluous." 11 Moore's Federal Practice § 56.02[1], p. 56-16.

A party moving for summary judgment thus "is held to a stringent standard." 10A Wright, Miller, & Kane § 2727, p. 457. In evaluating a summary judgment motion, "any doubt as to the existence of a genuine issue of material fact will be resolved against the movant." Id. § 2727, pp.

---

[19]At the time the Government filed the Statement of Facts that accompanied its motion for summary judgment, and at the time Macclenny filed its response to the Government's motion, the applicable rule required a movant to file "a separate, short and concise statement . . . of the material facts as to which the moving party contends there is no genuine issue to be tried," and further stated:

> All material facts set out in the statement [of material facts] required to be served by the movant *will be deemed admitted* unless controverted by the [responsive] statement required to be served by the opposing party.

USCIT R. 56(h)(1) & (3) (effective Jan. 1, 2009) (emphasis added).

457-58.  In addition, "[b]ecause the burden is on the movant, the evidence . . . always is construed

in favor of the party opposing the motion and the opponent is given the benefit of all favorable

inferences that can be drawn from it."  *Id*. § 2727, p. 459.  Moreover, "facts asserted by the party

opposing the motion, if supported by affidavits or other evidentiary material, are regarded as true."

*Id*. § 2727, pp. 459-62.

In short, because the effect of the entry of summary judgment is "rather drastic," summary

judgment is to be "cautiously invoked" and used "with a due regard for its purposes."  10A Wright,

Miller, & Kane § 2712, pp. 215-16.  Summary judgment thus is not appropriate where there are

"[d]oubts as to the credibility of a movant's affiants or witnesses."  *Id*. § 2726, p. 440.  Similarly,

summary judgment is not appropriate where "the evidence presented . . . is subject to conflicting

interpretations, or reasonable people might differ as to its significance."  *Id*. § 2725, pp. 433-37.

And summary judgment is not appropriate "if the existence of material fact issues is uncertain."  *Id*.

§ 2712, p. 210.  Further, although "[t]he fact that difficult questions of law exist or that the parties

differ on the legal conclusions to be drawn from the facts is not in and of itself a ground for denying

summary judgment," "[i]t does not follow . . . that the difficulty of the legal issues is completely

irrelevant to the grant or denial of summary judgment."  *Id*. § 2725, pp. 410-12.  As a practical

matter:

> Before the court can apply the law, it must have an adequate factual basis for doing
> so.  In some situations, a fuller development of the facts may serve to clarify the law
> or help the court determine its application to the case.  As a result, the resolution of
> complex questions of law frequently requires a more concrete factual development
> than may be obtained through summary proceedings.

*Id*. § 2725, pp. 412-15.

Accordingly, as one leading authority sums up the state of the law, summary judgment is a device that is properly reserved only for those actions which are truly "clear cases."  10A Wright, Miller, & Kane § 2725, pp. 428-29.[20]

## III.  Analysis

As outlined above, the parties have filed a number of dispositive motions.  The Government's pending motions include a motion to dismiss for lack of subject matter jurisdiction, a motion to dismiss for failure to state a claim upon which relief can be granted, and a motion for summary judgment as to certain entries pursuant to the United States-Caribbean Basin Trade Partnership Act ("CBTPA").  In addition, the Government and Macclenny have filed cross-motions for summary judgment concerning the proper basis for appraisement of the merchandise at issue.

Each of the parties' motions is analyzed in turn below.

A.  The Government's Dispositive Motions

Three of the Government's four pending motions are addressed to Macclenny's claim for duty-free treatment pursuant to the  CBTPA.  As discussed below, all three motions are meritorious and must be granted.  *See generally* section III.A.1, *infra*.  In contrast, for the reasons set forth in detail, the Government's motion for summary judgment sustaining Customs' use of transaction value to appraise Macclenny's merchandise fails on both the facts and the law.  That motion

---

[20]Where a motion for summary judgment has been denied, there is nothing that inherently and necessarily precludes the movant from again seeking summary judgment, whether on the same or different grounds. *See, e.g.*, 11 Moore's Federal Practice § 56.121, pp. 56-299-56-307 (discussing "Multiple and Successive Summary Judgment Motions"); 10A Wright, Miller, & Kane § 2712, pp. 214-15 (noting that renewal of summary judgment motion may be "particularly appropriate" where subsequent discovery reveals facts not available at time of first motion).

accordingly must be denied.  *See generally* section III.A.2, *infra*.

### 1.  Macclenny's CBTPA Claim

The Government has moved to dismiss for lack of subject matter jurisdiction Macclenny's CBTPA claim as to all entries other than those covered by Protest No. 1803-04-100056.  As discussed  below, the three protests at issue other than Protest No. 1803-04-100056 did not assert CBTPA claims.  The Government's motion to dismiss therefore must be granted.

Further, the Government has moved to dismiss for failure to state a claim Macclenny's CBTPA claim with respect to the four entries covered by Protest No. 1803-04-100056 which were made before October 2, 2000, the effective date of the CBTPA as to goods from Nicaragua.  As detailed below, whether the matter is analyzed under the rubric of a motion to dismiss for failure to state a claim or, alternatively, as a motion for judgment on the pleadings or for summary judgment, the Government's request for relief must be granted and Macclenny's CBTPA claim must be denied or dismissed as to those four entries.

As to the three remaining entries, the Government seeks summary judgment, requesting that the entries be reliquidated duty-free, with interest, pursuant to the CBTPA.  As set forth below, that motion too must be granted.

### a.  The Government's Motion to Dismiss for Lack of Subject Matter Jurisdiction

With respect to Macclenny's CBTPA claim, the Government seeks dismissal for lack of subject matter jurisdiction pursuant to USCIT Rule 12(b)(1) as to all entries covered by three of the four protests identified in the Summons and Complaint – *i.e.*, Protest Nos. 1803-03-100072, 1803-

04-100024, and 1803-04-100043.  In other words, the Government seeks dismissal of Macclenny's

CBTPA claim for lack of jurisdiction as to all entries other than those covered by Protest No. 1803-

04-100056.  *See generally* Def.'s Brief at 2, 9, 11-13; *see also* Answer and Counterclaim ¶ 1

(denying existence of subject matter jurisdiction "except for [entries] covered by Protest No. 1803-

04-100056, with respect to Plaintiff's claim for duty-free treatment" under CBTPA); *id.* ¶ 34

(asserting as affirmative defense "lack[] [of] subject matter jurisdiction over plaintiff's claim for

duty-free entry under [the CBTPA] . . . as regards all entries, except for those covered by Protest No.

1803-04-100056, because none of the other three protests . . . makes a CBTPA claim").[21]

Macclenny predicates jurisdiction here on 28 U.S.C. § 1581(a), which, "[b]y its terms, . . .

limits the jurisdiction of the Court of International Trade to appeals from denials of valid protests."

*See* Koike Aronson, Inc. v. United States, 165 F.3d 906, 908 (Fed. Cir. 1999); 28 U.S.C. § 1581(a).

To be valid, a protest must set forth – "distinctly and specifically" – "the nature of each objection

and the reasons therefor." 19 U.S.C. § 1514(c)(1)(C); *see also* 19 C.F.R. § 174.13(a)(6) (requiring

that protest detail "[t]he nature of, and justification for[,] the objection set forth distinctly and

specifically . . . ").  The statute further mandates that every protest identify – again, "distinctly and

---

[21]The scope and practical effect of the Government's motion to dismiss are somewhat unclear.  Macclenny's First Amended Complaint appears to limit the company's CBTPA claim to only those entries covered by the four protests at issue which were "entered on or after October 2, 2000" (the effective date of the CBTPA as to goods from Nicaragua). *See* First Amended Complaint ¶ 26.  It further appears that, of the three protests at issue other than Protest No. 1803-04-100056, only one protest – specifically, Protest No. 1803-03-100027 – covers entries that were made on or after October 2, 2000.  *See* First Amended Complaint at attached Schedule of Protests (listing entry numbers and respective dates of entry).  It thus appears that the Government's motion to dismiss actually implicates only the entries covered by Protest No. 1803-03-100027.  Nevertheless, in an abundance of caution, the entries covered by all three protests are addressed here, as presented by the Government's motion.

specifically" – the particular Customs decision(s) being protested.  *See* 19 U.S.C. § 1514(c)(1)(A).

The Court of Appeals has emphasized the "mandatory" nature of these statutory and regulatory

provisions, to ensure that all protests apprise Customs of the nature and character of the asserted

claims.  *See* Koike Aronson, 165 F.3d at 908-09; *see also* Davies v. Arthur, 96 U.S. 148, 151 (1877)

(holding that every protest "must be so distinct and specific, as, when fairly construed, to show that

the objection . . . was sufficient to notify [Customs] of its true nature and character").

Of the four protests at issue in this action, only Protest No. 1803-04-100056 sets forth a

CBTPA claim, asserting that "the said merchandise is properly duty-free as CBTPA-qualified

goods."  *See* Def.'s Brief at 12 (quoting Protest No. 1803-04-100056); *see also id*. at 2, 9.  The three

remaining protests are silent as to the CBTPA, alleging only that the relevant entries of merchandise

"are properly dutiable on the basis of deductive value."  *Id*. at 12 (quoting three other protests at

issue); *see also id*. at 2, 9.  Those three protests therefore were not valid as to any CBTPA claim,

because they failed to give Customs the requisite notice.

Because a valid protest (and the denial of that protest) is a prerequisite to subject matter

jurisdiction under 28 U.S.C. § 1581(a), Macclenny's CBTPA claim as to Protest Nos. 1803-03-

100072, 1803-04-100024, and 1803-04-100043 must be dismissed for want of jurisdiction.

Macclenny does not contend otherwise.  *See*, *e.g.*, Pl.'s Brief at 12 (acknowledging that CBTPA

claim is properly "*limited to the goods* covered by Entry Nos. WJP-000[2]470-8, WJP-0002492-2

and WJP-0002507-7 and *included in Protest No. 1803-04-100056 only*") (emphases added).[22]

_____

[22]*See also* Pl.'s Brief at 2 (claiming only that certain "merchandise included in Entry Nos.
WJP-0002470-8, WJP-0002492-2 and WJP-0002507-7 of Protest No. 1803-04-100056 . . .
qualif[ies] for duty-free treatment" under CBTPA); *id*. at 14 (arguing only that Customs should be
ordered to "reliquidate the three designated entries that qualify for duty-free treatment covered by

> b.  The Government's Motion to Dismiss for Failure to State a Claim
> or, Alternatively, Motion for Judgment on the Pleadings or Summary Judgment

Of the four protests at issue in this action, only Protest No. 1803-04-100056 sets forth a

CBTPA claim.  *See* Def.'s Brief at 12 (quoting Protest No. 1803-04-100056).  Of the seven entries

covered by that protest, the Government seeks dismissal for failure to state a claim as to

Macclenny's CBTPA claim with respect to Entry Nos. WJP-0002399-9, WJP-0002416-1, WJP-

0002429-4, and WJP-0002440-1 – *i.e.*, the four entries that were made prior to October 2, 2000, the

effective date of the CBTPA as to goods from Nicaragua.  *See id.* at 2 & n.3, 9, 11-13; USCIT R.

12(b)(5).[23]  Whether analyzed under the rubric of a motion to dismiss for failure to state a claim, or,

alternatively, a motion for judgment on the pleadings (USCIT Rule 12(c)) or a motion for summary

judgment (USCIT Rule 56), the Government's argument is equally sound.  *See* n.17, *supra*

(explaining that motion to dismiss for failure to state a claim filed after Answer should be treated

as motion for judgment on pleadings or motion for summary judgment).

As the Government correctly observes, only three of the seven entries covered by Protest No.

---

Protest No. 1803-04-100056 in accordance with [the CBTPA]"); *id.* at 16-17 (stating that Plaintiff intended that its CBTPA claim for duty-free treatment would apply only to "three entries covered by one Protest," and conceding that "the Court lacks jurisdiction to grant such relief with regard to the remaining entries in this case").

[23]Again, the scope and practical effect of the Government's motion are somewhat unclear. *Compare* n.21, *supra*.  In particular, Macclenny's First Amended Complaint appears to limit the company's CBTPA claim to only those entries which were "entered on or after October 2, 2000." *See* First Amended Complaint ¶ 26.  It thus appears that the Government's motion is addressed to entries that, in fact, are not the subject of Macclenny's CBTPA claim as set forth in the First Amended Complaint.  Nevertheless, for the sake of clarity and in an excess of caution, the four entries covered by Protest No. 1803-04-100056 which predate October 2, 2000 are addressed here, as presented by the Government's motion.

1803-04-100056 were made after October 2, 2000, the effective date of the CBTPA as to goods from

Nicaragua.  *See* Def.'s Brief at 2 & n.3, 9, 13.  No valid CBTPA claim can be asserted as to any

entries made before that date.  *See id.* at 9, 13; *see generally* Determination Under the Caribbean

Basin Trade Partnership Act, 65 Fed. Reg. 60,236 (Oct. 10, 2000) (stating that CBTPA applies only

to eligible goods imported on or after October 2, 2000).

Macclenny itself acknowledges that any CBTPA claim as to Entry Nos. WJP-0002399-9,

WJP-0002416-1, WJP-0002429-4, and WJP-0002440-1 lacks merit.  *See, e.g.*, Pl.'s Brief at 12

(conceding that CBTPA claim is properly "limited to the goods covered by Entry Nos. WJP-

000[2]470-8, WJP-0002492-2 and WJP-0002507-7").[24]  Accordingly, as to those four entries, the

Government's request for relief must be granted, and Macclenny's CBTPA claim must be denied

or dismissed.

c. <u>The Government's Motion for Summary Judgment as to Certain Entries</u>

All that remains of Macclenny's CBTPA claim are the three entries covered by Protest No.

1803-04-100056 that were entered on or after October 2, 2000 – *i.e.*, Entry Nos. WJP-0002470-8,

WJP-0002492-2, and WJP-0002507-7.[25]  The Government acknowledges that those three entries are

---

[24]*See also* Pl.'s Brief at 2 (claiming only that certain "merchandise included in Entry Nos. WJP-0002470-8, WJP-0002492-2 and WJP-0002507-7 of Protest No. 1803-04-100056 . . . qualif[ies] for duty-free treatment" under CBTPA); *id.* at 14 (arguing only that Customs should be ordered to "reliquidate the three designated entries that qualify for duty-free treatment covered by Protest No. 1803-04-100056 in accordance with [the CBTPA]"); *id.* at 16-17 (stating that Plaintiff intended that its CBTPA claim for duty-free treatment would apply only to "three entries covered by one Protest," and conceding that "the Court lacks jurisdiction to grant such relief with regard to the remaining entries in this case").

[25]Entry No. WJP-0002470-8 was entered on October 10, 2000; Entry No. WJP-0002492-2 was entered on October 16, 2000; and Entry No. WJP-0002507-7 was entered on October 19, 2000.

entitled to duty-free treatment under the United States-Caribbean Basin Trade Partnership Act, and

seeks summary judgment reliquidating them accordingly. *See* Def.'s Brief at 2 & n.3, 13, 29; Def.'s

Reply Brief at 3 n.4, 20; Def.'s Supp. Brief at 10. Not surprisingly, Macclenny concurs in the

Government's motion. *See* Pl.'s Brief at 2, 3 n.1, 12-13, 14, 16-17, 32-33.[26]

As discussed in section I above, eligible goods from beneficiary countries may be imported

into the United States duty-free under the CBTPA. *See generally* 19 U.S.C. §§ 2702-03 (listing

certain countries and goods as eligible for duty-free treatment under CBTPA). Nicaragua was

formally granted beneficiary status under the CBTPA as of October 2, 2000. *See* 19 U.S.C. §

2702(b) (listing Nicaragua as eligible for designation as beneficiary country under CBTPA);

Determination Under the Caribbean Basin Trade Partnership Act, 65 Fed. Reg. at 60,236 (granting

Nicaragua beneficiary status, and modifying HTSUS, effective Oct. 2, 2000).

The goods eligible for duty-free treatment under the CBTPA include merchandise classified

under HTSUS subheading 9802.00.80. *See* 19 U.S.C. § 2703(b)(2)(A)(i)(I). Specifically, those

"apparel articles" that are assembled in a CBTPA beneficiary country (such as Nicaragua) "from

fabrics wholly formed and cut in the United States" and imported directly into the United States

---

*See* First Amended Complaint at attached Schedule of Protests (listing entry numbers and respective dates of entry); Def.'s Brief at 13 (same). Although both parties state that Entry No. WJP-0002507-7 was made on October 9, 2000, the original entry papers indicate that the date of entry was actually October 19, 2000. Whether the date was October 9, 2000 or October 19, 2000 is not material. Both dates are after October 2, 2000, the effective date of the CBTPA as to goods from Nicaragua.

[26]Indeed, Macclenny now advises that it intended to assert a CBTPA claim for duty-free treatment only as to the three specified entries. *See, e.g.*, Pl.'s Brief at 16-17 (stating that Macclenny intended that its CBTPA claim for duty-free treatment would apply only to "three entries covered by one Protest," and conceding that "the Court lacks jurisdiction to grant such relief with regard to the remaining entries in this case").

under HTSUS subheading 9802.00.80 are entitled to duty-free treatment pursuant to the CBTPA. *See* U.S. Note 7(b)(i), Ch. 98, Subch. II, HTSUS; *see also* Proclamation 7351 of October 2, 2000 to Implement the United States-Caribbean Basin Trade Partnership Act, 65 Fed. Reg. 59,329, 59,333 (Oct. 4, 2000) (modifying HTSUS to include U.S. Note 7(b)(i), Ch. 98, Subch. II, HTSUS, effective Oct. 2, 2000).

Here, there is no dispute that Macclenny's suit-type jackets were properly classified under HTSUS subheading 9802.00.80.  *See* First Amended Complaint ¶ 25; Answer and Counterclaim ¶ 25.  Nor is there any dispute that Macclenny's merchandise was imported directly into the United States from Nicaragua.  *See* Plaintiff's Statement of Material Facts As To Which There Are No Genuine Issues To Be Tried ("Pl.'s Statement of Facts") ¶ 3; Defendant's Response to Plaintiff's Statement of Material Facts As To Which There Are No Genuine Issues To Be Tried ("Def.'s Response to Pl.'s Statement of Facts") ¶ 3.  It is similarly undisputed that the goods were assembled in Nicaragua (a beneficiary country under the CBTPA), from fabrics formed and cut in the United States.  *See* Pl.'s Statement of Facts ¶ 3; Def.'s Response to Pl.'s Statement of Facts ¶ 3.  Finally, there is no dispute that Entry Nos. WJP-0002470-8, WJP-0002492-2, and WJP-0002507-7 were entered after October 2, 2000.  *See* First Amended Complaint at attached Schedule of Protests (listing dates of entry); Def.'s Brief at 13 (acknowledging that three listed entries "were made after the effective date of the CBTPA" as to goods from Nicaragua); n.25, *supra* (identifying entry dates of the three subject entries).

As such, Entry Nos. WJP-0002470-8, WJP-0002492-2, and WJP-0002507-7 satisfied the requirements for duty-free treatment under the CBTPA.  The Government's motion as to the

specified entries therefore must be granted and the entries must be reliquidated, duty-free.

## 2. The Appropriate Method of Appraisement

In addition to seeking summary judgment as to the three entries entitled to duty-free treatment under the CBTPA (discussed above), the Government also seeks summary judgment sustaining Customs' use of transaction value to appraise all other entries at issue in this action. Specifically, the Government contends that, although the buyer (*i.e.*, Macclenny/BCG) and the seller (*i.e.*, KB) were related, the valuation statute nevertheless required appraisement based on transaction value, because – according to the Government – "the circumstances of the sale . . . indicate[] that the relationship . . . did not influence the price" that Macclenny/BCG paid to KB. *See generally* 19 U.S.C. § 1401a(b)(2)(B); Def.'s Brief at 9, 13 -20, 26, 28, 29; Def.'s Reply Brief at 1-12, 16, 20; Def.'s Supp. Brief at 8-9, *passim*; Def.'s Supp. Reply Brief at 1-8.[27]   For the reasons summarized below, summary judgment must be denied.

In an effort to demonstrate that the "circumstances of the sale" test is satisfied in this case, the Government invokes Interpretative Note 2 to 19 C.F.R. § 152.103(l)(1), asserting, in essence, that the prices that Mr. Looby (BCG's Chief Operating Officer) set for KB were "settled in a manner

---

[27]This is an atypical case in at least one key respect: It is Customs – not the importer – that is advocating for appraisement based on transaction value.  As the Government points out, "it is unusual for *an importer* to contend that transaction value should *not* be applied.  It is far more common for an importer that is related to its supplier to provide information to the appraiser in a quest to confirm transaction value as the appropriate methodology."  Def.'s Supp. Brief at 9 n.5; *see also* Def.'s Supp. Reply Brief at 3 (reiterating "the rarity of an importer seeking to have a valuation methodology *other than* transaction value applied to its goods").  The Government warns that caution therefore must be exercised "in applying any situation-specific authority, including Customs rulings or judicial decisions" in deciding this case, "unless the situation reviewed in the referenced authority involves an importer trying to remove its transactions from appraisal under transaction value."  *See id*.

*consistent with the normal pricing practices of the industry in question.*"   *See* 19 C.F.R. §

152.103(l)(1)(ii) (emphasis added); Def.'s Brief at 16 (quoting Interpretative Note 2); Def.'s Reply

Brief at 10 (referring to prices set "in the 'normal' manner for a garment assembler"); Def.'s Reply

Brief at 12 (referring to "normal pricing practices for the garment industry").[28]   Thus, to

---

[28]*See also* Def.'s Brief at 16 (referring to "normal manner for the industry"); Def.'s Brief at 17 (referring to "normal industry practices"); Def.'s Reply Brief at 11(citing, *inter alia*, Interpretative Note 2 and referring to "normal pricing practices of the industry"); Def.'s Supp. Brief at 6 (referring to "normal pricing practices of the industry in question," quoting Customs Valuation Code); *id*. at 8 (referring to "normal pricing practices of the industry"); *id*. at 9 (referring, in two places, to "normal pricing practices of the industry"); Def.'s Supp. Reply Brief at 3 (referring to "normal pricing practices of the industry in question," citing Interpretative Note 2); *id*. at 4 (referring, in two places, to "normal pricing practices"); *id*. at 6 (referring to "normal pricing practices in the industry"); *id*. at 7 (referring to "manner [in which] prices are normally set in [the] industry"); *id*. (referring to "normal pricing practices").

   At various points in its briefs, the Government frames tests or standards in other terms.  *See, e.g.*, Def.'s Brief at 15 (asserting, in caption, that "The Evidence Establishes That the Prices Between KB and Macclenny Were Set in the Same Manner as Prices Are Normally Set for Sales Between Unrelated Parties"); *id*. at 26 (asserting that prices "were set in the same manner as prices are set between unrelated entities"); Def.'s Reply Brief at 4 (asserting that prices "were determined using the same method as would be employed in transactions between unrelated entities"); *id*. at 6 (asserting that prices "were set in the same manner as prices are set between unrelated parties"); *id*. at 7 (asserting that prices were not set "differently than they would have been if the buyer and the seller were not related"); Def.'s Supp. Brief at 6 (discussing circumstances where "the manner in which the price was derived is essentially the same as it would be for parties that are not related"); *id*. at 8 (asserting that prices "were set in the same manner as a price would have been set for transactions between unrelated [parties]").

   These miscellaneous references conflate concepts and language in Interpretative Notes 1 and 2 other than the specific provision on which the Government here relies – that is, the provision of Interpretative Note 2 stating that the use of transaction value is appropriate in a related party transaction "[i]f the price has been settled in a manner consistent with the normal pricing practices of the industry in question."  *See, e.g.*, Def.'s Brief at 16 (quoting "consistent with the normal pricing practices of the industry" test, and omitting any reference to whether "the price has been settled in a manner consistent . . . with the way the seller settles prices to [unrelated] buyers"); Def.'s Reply Brief at 9 (same).

   According to the Government, Interpretative Note 1 – which concerns "the way in which the

_____

price in question was arrived at" – has no relevance to this case, because that note "applies to situations not present here, *i.e.*, when Customs has previously examined the relationship or already has 'sufficient detailed information concerning the buyer and seller to be satisfied that the relationship did not influence the price actually paid or payable.'" *See* Def.'s Supp. Reply Brief at 2 n.1. *But see* Def.'s Reply Brief at 10-11 (where Government appears to rely, in part, on Interpretative Note 1). Thus, to the extent that they differ materially from the standard of "the normal pricing practices of the industry," any of the above-listed references that relate to consideration of "the way in which the price in question was arrived at" (or words to that effect) miss the mark.

Similarly, some of the references listed above are variations on provisions of Interpretative Note 2 other than the "normal industry pricing practices" test on which the Government here relies. As the Government explains, the introductory text of Interpretative Note 2 – concerning whether a related buyer and seller "buy from and sell to each other as if they were not related" – does not itself set forth a test for the use of transaction value in related party sales. *See* Def.'s Supp. Reply Brief at 3-4. Instead, that introductory text articulates an overall standard which can be satisfied by either of two alternative tests set forth in Note 2: [1] whether "the price has been settled in a manner consistent with the normal pricing practices of the industry in question" (which is the test that the Government invokes in this case) and [2] whether "the price has been settled in a manner consistent . . . with the way the seller settles prices for sales to buyers who are not related to him." *See id*. The introductory text of Interpretative Note 2 thus has no significance independent of the specific test on which the Government here relies – *i.e.*, whether "the price has been settled in a manner consistent with the normal pricing practices of the industry in question." And the second test set forth in Interpretative Note 2 (*i.e.*, whether "the price has been settled in a manner consistent . . . with the way the seller settles prices for sales to [unrelated] buyers") has no application here, because the seller in this case (KB) made no sales whatsoever to buyers other Macclenny/BCG. *See* What Every Member of the Trade Community Should Know About: Determining the Acceptability of Transaction Value for Related Party Transactions (U.S. Dep't of Homeland Security April 2007) ("Customs Guidance on Acceptability of Transaction Value in Related Party Transactions") at 10 (appended to Pl.'s Supp. Reply Brief) (explaining that the second test in Interpretative Note 2 is limited to "situations where the seller sells the same merchandise to both related and unrelated parties").

It is further worth noting that, at several points in its briefs, the Government appears to assert that the relevant test has two distinct components – (1) whether the prices at issue were "settled in a manner consistent with the normal pricing practices of the industry in question" *and* (2) whether the prices reflected some projected margin of profit – as if the expectation of profit were a separate criterion, above and beyond consistency with the normal pricing practices of the industry. *See, e.g.*, Def.'s Brief at 17 (indicating that the test is whether price "was set in a manner that comports with normal industry practices *and was expected to result in . . . a reasonable profit*") (emphasis added); *see also* Def.'s Reply Brief at 12 (framing the test as "normal pricing practices for the garment

prevail on its motion for summary judgment sustaining Customs' use of transaction value here, the

Government must prove that undisputed record evidence establishes both (1) the manner in which

KB's prices were set, and (2) "the normal pricing practices" of the garment assembly industry; and,

further, (3) the Government must demonstrate that those two are "consistent."[29]

The Government fails on all counts.  The evidence that the Government cites to prove how

Mr. Looby set KB's prices is thin, at best.  And the evidence of normal pricing practices in the

garment assembly industry is virtually non-existent.  Moreover, the Government makes no real

attempt to demonstrate that the manner in which Mr. Looby set KB's prices was consistent with

normal industry practice – which is the fundamental showing that the Government must make to

establish its entitlement to summary judgment here.

---

industry . . . , with some amount of profit built in once the company is a mature facility"); Def.'s
Supp. Brief at 8 (indicating that test is whether prices were "set in a manner consistent with the
normal pricing practices of the industry, and in a manner believed to be adequate to ensure recovery
of . . . a profit once KB became a mature facility"); *id*. at 9 (arguing that – to demonstrate that the
relationship between KB and Macclenny/BCG influenced prices – Macclenny could "demonstrate
that the price . . . was set in a manner that was *not* consistent with the normal pricing practices of
the industry and/or was *not* set in a manner that was expected to ultimately yield a profit"); *id*.
(indicating that test is whether price was "set in a manner consistent with the normal pricing
practices of the industry and/or with the expectation that . . . a profit will be earned").  However,
nothing in the parties' papers supports the notion of such a two-part test (although it does not seem
far-fetched to assume that a margin of profit is inherent in the normal pricing practices of any
industry).

In sum, for purposes of the instant motion for summary judgment, the sole relevant test is
whether Mr. Looby set prices for KB "in a manner consistent with the normal pricing practices" of
the garment assembly industry.

[29]*See generally* Customs Guidance on Acceptability of Transaction Value in Related Party
Transactions at 7-8 (explaining that, to prove that transaction value is acceptable because the price
was settled in accordance with normal industry pricing practices, party "must [1] have objective
evidence of the normal pricing practices of the industry in question and [2] present evidence that the
transfer price was settled in accordance with these industry practices").

As to the manner in which KB's prices were set, the Government repeatedly stresses that Mr.

Looby has "decades of price-setting experience in the men's tailored clothing business," and was

– as Mr. Looby put it – "fully capable of assessing a reasonable price." *See* Defendant's Statement

of Material Facts As To Which There Are No Genuine Issues To Be Tried ("Def.'s Statement of

Facts") ¶ 24 (asserting that Looby "was experienced in setting prices for garments and was 'fully

capable of assessing a reasonable price'") (quoting Looby Deposition at 146); Def.'s Supp. Reply

Brief at 7.[30]   However, it is one thing to establish that Mr. Looby had the ability to set prices at an

appropriate level.  It is quite a different matter to establish that he in fact did so here.[31]   The greatest

concession that the Government could extract from Mr. Looby was essentially a tautology – *i.e.*, he

---

[30]*See also*, *e.g.*, Def.'s Brief at 6 (asserting that Looby "was experienced in setting garment prices and was 'fully capable of assessing a reasonable price'"); Def.'s Reply Brief at 7 (asserting that Looby "possesses significant experience in the garment industry and . . . was familiar with how prices are set in . . . that industry," and that Looby was "fully aware of how to determine garment assembly prices in a manner that would ultimately earn the assembler a profit once its start-up costs were fully amortized"); *id*. at 11 (asserting that "given his extensive experience in the garment industry, Mr. Looby would know how prices are set in that industry," and noting that Looby "testified that he was 'fully capable of assessing a reasonable price' and agreed . . . that he is 'experienced in setting prices for garments'") (quoting Looby Deposition at 146-47).

[31]As discussed in greater detail below, the prices that Mr. Looby set for KB never even covered the company's expenses.  KB operated at a loss each and every year of its existence, from the time the company began production in 1998 until the company ceased operations in 2007. *See*, *e.g.*, Def.'s Reply Brief at 5 (implicitly acknowledging that KB "fail[ed] to earn a profit year after year"); Pl.'s Brief at 18 (asserting that, for every year of company's operations, "KB's total expenses exceeded its total income each year, resulting in a loss for each year").

As an aside, it is worth noting that – although the entries in question here were made in 2000/2001 – both parties freely rely on information concerning Mr. Looby's pricing practices and KB's operations over the entire life of the company (from 1997 to 2007).  With just one early exception, neither part has questioned the relevance or probity of such information. *See* Def.'s Response to Pl.'s Statement of Facts ¶ 21 (as to certain allegations relating to Government's counterclaim, asserting that "since the entries at issue were made in 2000 and 2001 . . . , any figures for 1999 are irrelevant to this action").

characterized the prices that he set for KB as "*reasonable*" because "the numerous elements in the

operating budget were *reasonable*."   *See* Def.'s Brief at 18 (citing, and characterizing, Looby

Deposition at 147-48) (emphases added).[32]  The Government's emphasis on Mr. Looby's knowledge

of pricing practices does little to advance its case.

The Government's principal claim concerning KB's prices is a broad assertion that Mr.

Looby relied on "detailed" annual budgets in determining the prices that Macclenny/BCG paid to

KB – that is, that "prices were set based upon budgets that projected the exporter's income and

expenses and at a level that was expected to reap a profit once the exporter's start-up costs were

fully amortized."   *See* Def.'s Reply Brief at 2-3 (characterizing the foregoing as the Government's

"most relevant argument"); Def.'s Brief at 6 (asserting that "prices were based upon detailed budgets

relating to KB's anticipated productivity and expenses").[33]  But that is not saying much.  On some

---

[32]As the Government explains:

> Specifically, when asked what made the price "reasonable," Mr. Looby stated "[m]y familiarity with the labor content and my familiarity with the planned budgets and believing that those things . . . were reasonable. . . ."  He further explained that, in his industry, a price would be "unreasonable" where "either one side or the other was egregiously beneficial [sic] or hurt."

Def.'s Brief at 18 (quoting Looby Deposition at 147-48).  *See also*, *e.g.*, Def.'s Reply Brief at 11 (arguing that Looby stated that "the KB prices he set were 'reasonable,'" and that "[w]hen asked to elaborate upon why he believed the prices he set to be 'reasonable,' Mr. Looby stated it was because he used 'reasonable' budgets") (quoting, and characterizing, Looby Deposition at 146-47); *id*. (stating that Looby "testified that the prices he set for KB were based upon his 'belief of what it ought to end up costing and be reasonable for the labor content of the garment'") (quoting Looby Deposition at 146).

[33]*See also*, *e.g.*, Def.'s Statement of Facts ¶¶ 27-30 (asserting that "prices were based upon . . . detailed budgets" which were "intended to reflect KB's 'reality' regarding anticipated expenses and anticipated production" and included "monthly plans for production, labor costs and overhead expense costs," and which were "prepared for KB by BCG's vice president of manufacturing, a

level, every seller bases its prices on some form of budget (albeit not necessarily a formal, written

one); and the goal of basically all commercial sales activity is to turn a profit.  The Government's

assertion that KB's prices were derived from budgets and anticipated profits at some unspecified

point in the future is thus so generic and universal as to be largely meaningless.

    The evidence that the Government cites to support its generalized claim is similarly abstract

and lacking in sufficient specificity.  Conspicuously lacking is evidence that describes with

particularity how Mr. Looby used the "detailed" annual budgets that the Government touts to derive

prices for KB.  For example, the evidence on which the Government relies fails to adequately

explain whether/when Mr. Looby's pricing practices were intended to yield a profit for KB[34] (and,

---

'quality guy and trainer,' an engineer, and the KB plant manager") (quoting and/or citing Looby
Deposition at 157, 159-60, 166-67; Pl.'s Responses to Def.'s First and Third Interrogatories); Def.'s
Brief at 6 (asserting that prices were based on "detailed annual budgets which included monthly
plans for production, labor costs and overhead expense costs") (quoting Pl.'s Responses to Def.'s
First Interrogatories); *id.* at 17 (asserting that "prices were set based upon detailed budgets . . . that
were prepared for KB by BCG's vice president of manufacturing, a 'quality guy and trainer,' an
engineer, and the KB plant manager," and that "[e]ach year's projected budget was intended to
reflect KB's 'reality' regarding anticipated expenses and anticipated production"); *id.* at 19
(referring to testimony that prices were "based upon projected budgets"); *id.* at 20 (stating that
"KB's prices were set based upon detailed budgets"); Def.'s Reply Brief at 2-3 (arguing that "prices
were set based upon budgets that projected the exporter's income and expenses"); *id.* at 4 n.9
(referring to "the budgets upon which Mr. Looby based his pricing decisions for KB"); *id.* at 6
(asserting that "prices were set based upon projected budgets"); *id.* at 12 (asserting that "KB's prices
were set based upon detailed projected budgets"); Def.'s Supp. Reply Brief at 7 (asserting that
"prices were set . . . based upon detailed budgets").

    [34]At one point in its briefs, the Government states flatly that "KB's prices were set based
upon detailed budgets which, if accurate, *would have earned KB a profit on every garment sold*" –
seemingly indicating that KB's prices reflected an expectation of profit from Day One of production.
*See* Def.'s Brief at 20 (emphasis added); *see also id.* at 17 (asserting generally, without reference
to any time frame, that prices here were set "in a manner that . . . was expected to result in the seller
realizing a reasonable profit"); *id.* at 19 (asserting – with no temporal limitation – that "prices were
set to produce a reasonable profit for KB based upon projected budgets"); Def.'s Supp. Brief at 9
(asserting – without reservation – that Looby set prices "with the expectation that . . . a profit

if so, the intended margin of any such profit).[35]   Indeed, the Government is not clear even as to

[would] be earned"). However, that unqualified statement is at odds with the Government's position as articulated elsewhere in its briefs. Nor is such an assertion supported by the record evidence.

Instead, the Government's position appears to be that the prices that Mr. Looby set were *eventually* expected to yield a profit for KB, but not "in 'the start-up years.'" *See* Def.'s Statement of Facts ¶ 31 (citing Looby Deposition at 160, 169); *see also*, *e.g.*, *id.* ¶¶ 31-32 (asserting that "it was expected that, *after the start-up phase*, the price charged would . . . yield a reasonable profit," and that "[w]hen KB began production in 1998, it was expected to become a mature and profitable manufacturing facility *within a few years*") (citing Looby Deposition at 161, 184-85; Pl.'s Responses to Def.'s Third Interrogatories) (emphases added); Def.'s Brief at 17-18 (asserting that "[t]here was no anticipation of profit in 'the start-up years,'" and that "[i]t was expected that, after the start-up phase, the price charged would . . . yield a reasonable profit"); *id.* at 18 (asserting that, in 1998, profit was expected to "come within a few years"); Def.'s Reply Brief at 2-3 (asserting that Looby set prices "at a level that was expected to reap a profit once the exporter's start-up costs were fully amortized"); *id.* at 6 (asserting that prices reflected "the expectation that when KB became a mature manufacturing facility, it would earn a profit"); *id.* at 7-8 (asserting that Looby set prices "in a manner that would ultimately earn [KB] a profit once its start-up costs were fully amortized"); *id.* at 10 (asserting that "KB was not expected to be profitable at the beginning"); *id.* at 12 (asserting that prices were set with expectation that "a reasonable profit [would] be earned by [KB] after it [became] a mature facility"); Def.'s Supp. Brief at 8 (asserting that prices were set "in a manner believed to be adequate to ensure recovery of . . . a profit once KB became a mature facility"); *id.* at 9 (asserting that Looby set prices "in a manner that was expected to ultimately yield a profit"); Def.'s Supp. Reply Brief at 7 (asserting that prices were set "with the expectation of a profit once KB matured beyond the start-up phase").

In addition, it is not clear when the Government contends KB's start-up phase was complete, such that a profit would have been expected. For example, there is an inherent ambiguity in the Government's representation that "in 1998, KB was expected to become a mature manufacturing facility and profit would come within a few years. . . . The entries at issue were made *within those first few years.*" *See* Def.'s Brief at 18 (emphasis added); *see also* Def.'s Statement of Facts ¶ 33 (asserting that "[t]he entries at issue were made *within the first few years of KB starting production*") (emphasis added). The loose reference to "those first few years" can be read (in context) to indicate that the Government contends that KB was still in its start-up phase in 2000/2001, the dates of the entries in question. *But see*, *e.g.*, *id.* ¶¶ 31-32 (asserting that "[w]hen KB began production in 1998, it was expected to become a mature and profitable manufacturing facility *within a few years*") (emphasis added); *see also* Def.'s Brief at 23 (referring to "KB's start-up phase 'when little or no production was happening'"). The record is also notably barren of evidence addressing points such as the definition of a "start-up" phase or period, the typical duration of start-up operations in the garment assembly industry (including, *e.g.*, the usual period required to amortize start-up costs), and how long it normally takes garment assembly firms to show a profit. It is, in any event, undisputed that – over the life of the company – KB never turned a profit.

whether/when the prices that Mr. Looby set were designed to cover KB's costs.[36]  The long and the

---

[35]The Government cites no evidence quantifying in any way any profit margin that was built into the prices that Mr. Looby set or the extent of the profit that his prices were otherwise expected to yield.  Instead, the Government refers only vaguely and generally to a "reasonable" profit – or, even less definitively, to "*some level* of profit."  *See, e.g.*, Def.'s Statement of Facts ¶ 31 (asserting that "it was expected that, after the start-up phase, the price charged would . . . yield a reasonable profit") (citing Looby Deposition at 161; Pl.'s Responses to Def.'s Third Interrogatories); Def.'s Brief at 20 (asserting that prices set by Looby were "based upon an expectation that [KB] would . . . realize *some level of profit*") (emphasis added); *id.* (asserting that lack of Macclenny/BCG influence is demonstrated by fact that KB's prices projected simply "a" profit, of unspecified amount); *see also id.* at 17-18 (referring to "a reasonable profit"); *id.* at 19 (referring to "a reasonable profit"); Def.'s Reply Brief at 12 (referring to "a reasonable profit").

        Again, as noted above, it is undisputed that KB never generated a profit.

        [36]At several points in its briefs, the Government states – unequivocally, and without any limitation as to the time frame – that Mr. Looby's pricing practices were designed to ensure that KB would at least "break even" (*i.e.*, recoup all of the company's costs) from Day One of the company's operations.  *See* Def.'s Brief at 17 (citing Looby Deposition at 160, 169); *see also id.* at 20 (asserting, with no limitation, that prices set by Looby were "based upon an expectation that [KB] would cover its expenses"); Def.'s Reply Brief at 12 (asserting, without reservation, that Looby set KB's prices with expectation "that all budgeted costs [would be] covered"); Def.'s Supp. Brief at 9 (asserting, without qualification, that prices were set "with the expectation that all costs will be recovered").

        Elsewhere, however, the Government takes a conflicting position, claiming instead that the prices set by Mr. Looby were intended to cover KB's costs only *after* "start-up" operations were concluded.  *See, e.g.*, Def.'s Statement of Facts ¶ 31 (asserting that "it was expected that, after the start-up phase, the price charged would cover expenses") (citing Looby Deposition at 161; Pl.'s Responses to Def.'s Third Interrogatories); Def.'s Brief at 17-18 (asserting that "it was expected that, after the start-up phase, the price charged would cover expenses").  It is unclear whether any part of the confusion in the existing record results from the parties' use of imprecise terminology, failing to distinguish among production costs, operating costs, and other categories of costs (such as start-up costs).

        In any event, there is no dispute that, for the entirety of its nearly 10 years of operation, KB never once turned a profit, and, in fact, consistently operated at a loss.  *See, e.g.*, Def.'s Reply Brief at 5 (implicitly acknowledging that KB "fail[ed] to earn a profit year after year"); Pl.'s Statement of Facts ¶ 23 (stating that "KB's total expenses exceeded total income in each year resulting in a loss for each year," with no "profit of any sort") (citing, *inter alia*, Looby Affidavit ¶¶ 30-31) (a statement that the Government "denies for lack of knowledge or information," though the

Government also concedes that the statement is supported by Looby Affidavit ¶ 34); Pl.'s Brief at 18 (asserting that, for every year of company's operations, "KB's total expenses exceeded its total income each year, resulting in a loss for each year"); *id*. at 22 (same); Pl.'s Reply Brief at 2 (same); *id*. at 3 (same); *id*. at 9-10 (same); *id*. at 17 (same); Pl.'s Supp. Brief at 1 (same); *id*. at 4 (same); *id*. at 5 (same).

Highlighting the facts of this case, Macclenny raises the question why – absent a buyer's "influence" over the seller – any seller that repeatedly failed to realize a profit on its sales (much less continued to pile up *actual losses*) would not feel compelled to take action (such as by raising its prices and/or seeking out additional customers), in an effort to, at a minimum, stanch the bleeding. *See, e.g.*, Pl.'s Reply Brief at 10 (arguing that, with KB consistently operating at a loss, "[l]ogic would dictate a change . . . either an increase in prices in sales to [Macclenny/BCG] or a campaign to find and sell to other buyers at prices more likely to realize a profit for [KB]"); *see also* Pl.'s Brief at 19 (arguing that, where buyer and seller are not related, seller faced with repeated losses would "seek[] other business with the hope of earning a profit"); *id*. (arguing that, given continued losses, "if KB were not related to BCG . . . , good business sense would dictate either that KB raise[] its prices [for] its sales to BCG or that KB find[] and sell[] to other customers at prices [yielding] a reasonable profit"); Pl.'s Supp. Brief at 5 (arguing that "it was not consistent with industry practice or Macclenny's transactions with unrelated sellers for KB to continue . . . to sell to Macclenny at prices that never recovered [KB's] costs, without at least trying to find an alternative buyer").

The Government makes much of the fact that there is no statutory or other authority that restricts the use of transaction value in related party sales to only those cases where the seller has more than one customer and/or successfully turns a profit. *See, e.g.*, Def.'s Brief at 16-17 (arguing that "there is no authority for the proposition that transaction value applies only when the seller makes a profit," and that "[n]either [19 C.F.R. § 152.103(1)] or its interpretive notes, nor any statutory authority requires the realization of a profit for transaction value to apply to a related party sale"); *see also id*. at 10 (arguing that, as a matter of law, it is irrelevant "whether a profit was realized"); Def.'s Reply Brief at 6 (arguing that "the value statute says nothing about how many customers a seller may have and is silent regarding a seller's profitability"); *id*. at 10 (arguing that "there is no interpretive note limiting the applicability of transaction value in related party transactions to situations in which the seller actually realizes a profit"); *id*. at 12 (arguing that "it makes no difference to a transaction value assessment whether the seller has one customer or a thousand"); *see generally* Def.'s Brief at 5-6; Def.'s Reply Brief at 8-12.

Yet the mere absence of a legal requirement does not necessarily render irrelevant the fact that KB not only never turned a profit, but operated each and every year at a loss, for a total of roughly nine years. Moreover, while it is true that Mr. Looby raised prices once sometime between late July 1999 and the time of the entries at issue here in 2000/2001, that price increase obviously was not sufficient to cover KB's costs, because – notwithstanding the increase – the company still continued to lose money. *See* Def.'s Statement of Facts ¶¶ 41, 43 (noting that Looby raised prices

---

"sometime after July 26, 1999" and once again "in 2005") (citing Looby Deposition at 153-55, 200); *see also* Pl.'s Brief at 21 (stating that Looby increased KB's prices only twice in the company's nine years of operation – first, "for the fall season in 2000," and then once again, in December 2005) Def.'s Brief at 19 (essentially the same).   In light of KB's sustained record of losses, the Government's claim that further price increases were unnecessary "because dividing . . . projected total costs by . . . projected equivalent units yields a figure quite close to the invoice price" is curious, to say the least.  *See* Def.'s Reply Brief at 11 n.16.  In other words, if (as the Government postulates) invoice price is equivalent to projected total costs divided by projected output, there is obviously no profit at all – and one would assume that, in general, a potential price increase would be one of the options on the table.

The Government maintains that, as a matter of commercial reality, "profits are not guaranteed, even in transactions between unrelated parties" and that "it is not at all unusual for new companies not to earn a profit – or even to fail altogether – in the first few years of existence."  *See* Def.'s Brief at 20; *see also id*. (asserting that, because "prices for goods that have not been produced are set based upon anticipated expenses, it is always possible that the expenses will be higher and the expected profit will not materialize," that "[u]nrealized profit does not, by itself, render the circumstances of sale unusual from a business standpoint," and that "[p]rojections can be wrong and new businesses may have more 'growing pains' than anticipated"); Def.'s Reply Brief at 9-10 (asserting that "[n]o business, even one selling to unrelated customers, is guaranteed to earn a profit," and that "[a] seller's lack of profitability is not necessarily a consequence of prices being set too low, or of collusion between buyer and seller; it may just be a consequence of unanticipated factors, such as labor costs that turn out to be higher than those that were included in the projected budget upon which the prices were based" – although it is perhaps telling that the Government does not address whether it is reasonable to ascribe nearly a decade's worth of consistent losses, year after year, to factors such as underestimated expenses or overestimated productivity).

Drawing a bright line between *projected* profit and the actual *realization* of profit, the Government's position seems to be that – provided that a seller's prices to a related buyer at least purport to reflect some allowance for profit – it is of no moment whether any profit ever really materializes (or even whether the seller is outright hemorrhaging money, incurring massive losses year after year after year).  *See, e.g.*, Def.'s Brief at 17 (arguing that use of transaction value in related party sales does not require seller's "realization of a profit," and that it is enough if, *inter alia*, the price "was *expected* to result in the seller making a reasonable profit") (emphasis added); Def.'s Reply Brief at 5 (deriding Macclenny's argument that "when a seller . . . fails to earn a profit year after year, . . . the relationship between the buyer and seller *must* have influenced the price").

The Government contends that what is determinative in this case is that "the *hope* of a profit was maintained *year after year*."  *See* Def.'s Reply Brief at 10 (emphases added).  As Macclenny suggests, however, it is a fair question whether – absent the "influence" of a related buyer – a seller consistently operating at a loss could or would keep its doors open indefinitely (here, for nearly a

short of the matter is that the record evidence fails to adequately explain how budgets were used to

determine the prices at issue here.

The Government points to certain testimony that describes in broad strokes the process that

was used to set the price for KB at the time the company was founded, and extrapolates from that

for subsequent years up to 2001. *See generally* Def.'s Brief at 18-19 (citing, *inter alia*, Looby

Deposition at 172-73, 177-78, 181-82); *see also* Def.'s Reply Brief at 11 n.16.  But this evidence

---

decade).  *See, e.g.*, Pl.'s Brief at 19 (emphasizing that Government's position is that,"[even] if BCG
and KB were not related, KB [nevertheless] would continue [to operate at a loss] for the years that
it did"); Pl.'s Supp. Brief at 5 (asserting that "it was not consistent with industry practice" for KB
to continue to sell to Macclenny/BCG at a loss for years).

   The Government never stakes out a position as to how long a seller can continue making
profit-less (or losing) sales to a related buyer before the specter of the related buyer's "influence"
is raised.  Similarly, the Government never clarifies whether – to justify the use of transaction value
in a related party transaction – a seller's projections (including projected profits, as well as, *inter
alia*, projected expenses and projections concerning productivity) must be reasonable and realistic.
*See, e.g.*, Def.'s Reply Brief at 10 (emphasizing the "hope" and "expectation" that prices set for KB
would result in profit, with no scrutiny of the reasonableness of such hopes and expectations).  It is
also unclear how soon, according to the Government, a seller reasonably should be expected to
reflect a projected margin of profit in its prices (*e.g.*, how long "start-up" operations can extend).
*Cf.* n.34, *supra* (discussing, *inter alia*, absence of evidence concerning typical duration of start-up
period in garment assembly industry and how long it normally takes garment assembly firms to
show profit).

   Finally, as discussed above, the Government fails to grapple in any way with the meaning
of the term "reasonable" profit.  *See, e.g.*, Def.'s Brief at 17 (asserting that absence of influence is
indicated where, *inter alia*, prices reflected expectation that they would "result in the seller realizing
a *reasonable* profit") (emphasis added).  Further, as discussed above, at some points the Government
seems to contend that a related buyer's influence is demonstrated only where the seller's prices
incorporate *no projected profit margin whatsoever.  See, e.g.*, *id.* at 20 (indicating that there is no
influence in a related party transaction if seller's prices reflect even "*some level* of profit")
(emphasis added); *id.* (asserting that lack of Macclenny/BCG influence is demonstrated by fact that
KB's prices projected simply "a" profit, of unspecified amount).  At least at first blush, however,
it would seem that a related buyer's influence over a seller logically could be evidenced by a profit
margin that is even just slightly lower than would otherwise be the case.  It is unclear why a
wholesale absence of profit margin should be required to prove influence.

too is of limited value.  It says little more than that price "was determined by dividing the total

projected costs by the budgeted number of units to be produced and then *possibly rounding up or

down 5-10 cents*."  *See* Def.'s Brief at 18 (citing Looby Deposition at 173, 177) (emphasis added).

As such, the evidence is not definitive even as to whether or not prices for any particular year

reflected any adjustment to the product of the total projected costs divided by the number of units

(*i.e.*, the figure was "possibly" adjusted), much less the direction (*i.e.*, "up or down") or extent (*i.e.*,

"5-10 cents") of any such adjustment.  Nor does the Government cite any evidence explaining the

basis for determining whether or not to make such an adjustment (and, if so, the amount of that

adjustment).[37]

---

[37]As part of its case on the manner in which KB's prices were set, the Government also relies on a September 2001 letter from Macclenny's former counsel (now deceased) stating that, in 1999, "KB, in its startup phase, decided on the unit prices for the imported wool jackets after arms' length negotiations with [Macclenny/BCG]."  *See* Letter to Customs from Counsel for Macclenny (Sept. 27, 2001) (Def.'s Brief, Exh. A at 2); Def.'s Brief at 17 (asserting that "Macclenny's own attorney advised Customs that KB's prices . . . had been negotiated 'at arm's length,'" and that "[t]en years later, this statement was confirmed by the person primarily responsible for setting KB's prices") (citing, *inter alia*, Looby Deposition at 162-63); Def.'s Reply Brief at 6-7 (same); *see also* Def.'s Brief at 9 (asserting that, "as confirmed by [Mr. Looby], the transfer price between the parties was derived at arm's length"); Def.'s Supp. Brief at 4 n.3 (same).

The parties quarrel about the context and meaning of the letter's reference to "arms' length negotiations."  *See* Pl.'s Supp. Brief at 8-9; Pl.'s Supp. Reply Brief at 4; Def.'s Supp. Reply Brief at 5.  But that statement in the letter is "conclusory," and is not corroborated – in fact, is arguably contradicted – by other record evidence.  Under these circumstances, the statement merits little weight, particularly at the summary judgment stage.  *See generally* Customs Guidance on Acceptability of Transaction Value in Related Party Transactions at 10 (advising that Customs "often rejects circumstances of sale claims because the allegations are conclusory and not supported by evidence"); *id.* (stating that circumstances of sale claims will be rejected when party "alleges that the transfer price [was] negotiated at arm's length, but does not submit any evidence, such as correspondence between the parties, that reflects such negotiation").

Another major point of contention between the parties is the significance of the fact that prices were  never open to negotiation between KB and Macclenny/BCG; nor were prices ever the

subject of any offer/counter-offer process. *See*, *e.g.*, Def.'s Supp. Brief at 8 (conceding that "prices were not freely negotiated" between Macclenny/BCG and KB); Def.'s Supp. Reply Brief at 7 (admitting that "there was no actual back and forth negotiation between KB and Macclenny/BCG"); [Def.'s] Response to Court's Letter Request of November 22, 2013 at 2 (acknowledging that "the price was not freely negotiated between Macclenny/BCG and KB"); Looby Affidavit at ¶¶ 22-23 (attesting that prices were subject to negotiation between Macclenny/BCG and garment assembly contractors in Dominican Republic, Bulgaria, and Pacific Rim); Pl.'s Brief at 5 (contrasting "the offers and counteroffers and negotiations" between Macclenny/BCG and its contractors in the Dominican Republic, Bulgaria, and the Pacific Rim with Macclenny/BCG's practice *vis-a-vis* KB); *id*. at 21 (same); *id*. at 28 (same); *id*. at 32 (same); Pl.'s Reply Brief at 2 (asserting that KB's prices "were not determined as a result of arm's length negotiation between the buyer and the seller in a manner normally conducted in the trade"); *id*. at 3 (same); *id*. at 3-4 (arguing that KB prices were not "voluntarily negotiated and agreed upon, and accepted by both the buyer and the seller"); *id*. at 7 (asserting that, in this case, sales did not "result from an arm's length agreement between the buyer and the seller," and that KB was not free to "accept or reject the terms of an offer or counteroffer . . . [or to] engage in activities that reflect the pressures of the marketplace"); *id*. at 9 (stating that "Mr. Looby decided [KB's] prices on his own without any negotiations with KB personnel," and that KB's prices were set "with no negotiation at all"); *id*. at 10 (arguing that, "[i]n an arm's length transaction, two parties, each acting in his or her own interest and behalf, negotiate[] to arrive at an agreed upon price," but "[t]hat did not happen here"); *id*. at 17 (stating, *inter alia*, that KB prices "were not set by an agreement between the buyer and the seller and did not result from arm's length negotiations between the buyer and seller"); Pl.'s Supp. Brief at 4 (asserting that "KB did not make its own pricing decisions or its own decisions whether to accept or reject" Macclenny/BCG orders); *id*. at 5 (arguing that "prices between KB and Macclenny" were set very differently from prices that Macclenny paid to "unrelated suppliers"); Pl.'s Supp. Reply Brief at 4 (emphasizing that "the government acknowledges that in this case 'the prices were not freely negotiated between the buyer and seller'").

Macclenny paints the lack of negotiations between KB and Macclenny/BCG, and the absence of any exchanges of offers and counter-offers, as damning evidence against the Government.  The Government counters that the prices that Macclenny/BCG paid to other (unrelated) contractors were not always subject to negotiation, noting that Macclenny/BCG occasionally "dictated" prices to contractors other than KB.  *See*, *e.g.*, Def.'s Brief at 5 (stating that "[a]t times, Macclenny/BCG would tell X-Cell [the Dominican garment assembly contractor] the price it was willing to pay, usually for seasonal items," and that Macclenny/BCG would "sometimes tell its manufacturers [*i.e.*, contractors] what it would pay for a given product"); *id*. at 16 (same); Def.'s Reply Brief at 7 (citing Looby Deposition at 115, and asserting that Macclenny/BCG did not negotiate prices with other garment assembly contractors); *see also* Def.'s Brief at 20 (asserting that "it is not unusual for a buyer to dictate a price to a seller for particular items"); *cf*. Def.'s Supp. Reply Brief at 7 (arguing, *inter alia*, that – although "there was no actual back and forth negotiation between KB and Macclenny/BCG" – "negotiations are not a specific requirement of Interpretive Note 2").

Customs itself has cautioned that application of the circumstances of the sale test requires

consideration of "whether there is *sufficient evidence* to establish the alleged circumstances of the

sale." *See* What Every Member of the Trade Community Should Know About:  Determining the

Acceptability of Transaction Value for Related Party Transactions (U.S. Dep't of Homeland

Security April 2007) ("Customs Guidance on Acceptability of Transaction Value in Related Party

Transactions") at 9 (appended to Pl.'s Supp. Reply Brief) (emphasis added); *see also id*. at 10

(emphasizing requirement of "a *thorough explanation* of the circumstances surrounding the sale,"

including "supporting evidence") (emphasis added); *id*. (explaining that circumstances of sale claims

are rejected when assertions of fact "are . . . not supported by evidence").  Similarly, Customs has

emphasized that – where, as here, a party seeks to prove that transaction value is acceptable because

---

It is, however, undisputed that – whether or not Macclenny/BCG negotiated prices with its garment assembly contractors other than KB – Macclenny/BCG's other contractors were free to reject orders from the company, if, for example, the price "dictated" by Macclenny/BCG was too low.  *See, e.g.*, Def.'s Brief at 5 (stating that, when Macclenny/BCG sought to "dictate" a price to the Dominican garment assembly contractor X-Cell, "X-Cell would decide . . . whether to produce the goods at the dictated price"); *id*. at 20 (asserting that "[w]hether [a] seller agrees to a dictated price or gives up [a] sale is a function of whether it believes that it can produce the product at the [dictated] price and still expect to make some profit"); Pl.'s Supp. Brief at 5 (noting that "when Macclenny made offers to unrelated sellers," the sellers decided whether "to accept or reject the offer").  It is similarly undisputed that – unlike the other contractors – KB had no power to turn down any order from Macclenny/BCG.  Quite to the contrary, KB was required to fulfill all orders from Macclenny/BCG *and* to do so at the price set by Mr. Looby.  *See* [Def.'s] Response to Court's Letter Request of November 22, 2013 (acknowledging that "the record evidence . . . indicates that KB was not free either to set its own price or to refuse to produce merchandise at the price specified" by Macclenny/BCG); Pl.'s Supp. Brief at 4 (stating that KB could not "make . . . its own decisions whether to accept or reject" Macclenny/BCG's orders); Letter to Court from Counsel for Plaintiff (Nov. 26, 2013) (stating that "KB was obligated to deliver to Macclenny/BCG all merchandise ordered at the price specified by Macclenny/BCG and KB was not free to refuse to produce merchandise for Macclenny/BCG at the price specified by Macclenny/BCG").  The Government never directly addresses whether this particular aspect of the relationship between KB and Macclenny/BCG was, in the words of Interpretative Note 2, "consistent with the normal pricing practices" of the garment assembly industry.

prices were settled in accordance with normal industry pricing practices – "evidence that the . . . price was settled in accordance with . . . industry practices" is required. *See id*. at 8-9. On the existing record, the evidence is not sufficiently substantial to allow a reasonable person to understand at an appropriate level of detail the manner in which Mr. Looby set KB's prices. Nor is the evidence sufficiently substantial and detailed to permit comparison of the manner in which KB's prices were set to the normal pricing practices of the garment assembly industry. The evidence on KB's prices is simply insufficient to support summary judgment.

The Government's case on the other side of the equation – "the normal pricing practices of the [garment assembly] industry" – is even weaker than the Government's case on the manner in which KB's prices were set.[38] The Government points to relatively little evidence concerning the pricing practices of entities other than KB. And the quantum of evidence is by no means the only shortcoming in the Government's case. The evidence that the Government cites also is overly general. More importantly, none of the evidence cited by the Government specifically addresses the garment assembly industry. Most critically, the Government fails to demonstrate that Mr. Looby's

---

[38]Nowhere in its briefs does the Government discretely and succinctly outline the evidence which it contends constitutes proof of the normal pricing practices of the garment assembly industry. As a result, the court was forced to comb the Government's papers in an effort to identify for itself any such potential evidence. To a somewhat lesser extent, the court had to undertake a similar exercise to identify any evidence that the Government might arguably consider to be evidence of KB's pricing practices. In the future, to the extent that the parties continue to focus on the "normal industry pricing practices" test, they would be well advised to structure their presentations so as to clearly identify and address Mr. Looby's pricing practices *vis-a-vis* KB, and to separately identify and address the normal pricing practices of the garment assembly industry – and, in addition, to analyze and explain the extent to which those two parallel (or differ from) one another. Further, to the extent that either or both of the parties elects to again move for summary judgment, the parties should give careful consideration to the specific allocation of the burdens of production and persuasion on such motions. *See generally*, *e.g.*, 11 Moore's Federal Practice § 56.40-56.42, pp. 56-101-56-119 (analyzing "Burdens of Production and Persuasion" at summary judgment stage).

practices in setting prices for KB parallel the pricing practices of the garment assembly industry as

a whole.[39]

    As noted above, the Government's central thesis as to KB's pricing is that Mr. Looby set

---

    [39]At various points in its briefs, the Government goes beyond pricing practices in the garment *assembly* industry, which is the specific industry at issue here.  *Compare* Def.'s Reply Brief at 10 (referring to prices set "in the 'normal' manner for a *garment assembler*") (emphasis added); *id.* at 12 (referring to "normal pricing practices for the *garment industry*") (emphasis added).  In some instances, for example, the Government alludes to pricing practices in other sectors of the fashion apparel business, such as the manner in which Macclenny/BCG set its prices for sales to its own customers – *i.e.*, the prices for Macclenny/BCG's sales of merchandise to retailers such as Sears and JCPenney.  *See*, *e.g.*, Def.'s Brief at 5-6 (stating that "BCG's customers [*i.e.*, retailers] would sometimes tell BCG what price they were willing to pay"); *id.* at 16 (stating that "BCG customers sometimes dictated the prices they were willing to pay").

    At other points, the Government makes sweeping representations about pricing practices which are not specific to any industry at all – and which are not supported by citations to record evidence, to boot.  *See*, *e.g.*, Def.'s Brief at 20 (asserting, *inter alia*, that "it is not unusual for a buyer to dictate a price to a seller for particular items," and that "[w]hether the seller agrees to a dictated price . . . is a function of whether it believes that it can produce the product at the [dictated] price and still expect to make some profit"; stating that "[s]ince prices for goods that have not been produced are set based upon anticipated expenses, it is always possible that the expenses will be higher and the expected profit will not materialize"; claiming that "[u]nrealized profit" is not "unusual from a business standpoint"; arguing that "[p]rojections can be wrong and new businesses may have more 'growing pains' than anticipated," and that "profits are not guaranteed, even in transactions between unrelated parties"); Def.'s Reply Brief at 9-10 (asserting that "[n]o business, not even one selling to unrelated customers, is guaranteed to earn a profit" and that "it is not unusual for new companies not to earn a profit – or even to fail altogether – in the first few years of existence"); *id.* at 10 (asserting that "[a] seller's lack of profitability is not necessarily a consequence of prices being set too low, or of collusion between buyer and seller," but instead "may just be a consequence of unanticipated factors, such as labor costs that turn out to be higher than those that were included in the projected budget upon which the prices were based"); *id.* at 10 n.4 (citing article in Harvard Business School publication for the blanket proposition that "the failure rate for new business[es] is 30-40 percent," with no indication concerning the statistics for companies in the specific industry at issue here).

    All such evidence would appear to be irrelevant.  Neither party has argued that the relevant pricing practices are other than those of KB and the garment assembly industry of which KB was a part.

prices based on "detailed" budgets "that projected the exporter's income and expenses and at a level that was expected to reap a profit once the exporter's start-up costs were fully amortized." *See* Def.'s Brief at 6; Def.'s Reply Brief at 2-3. As discussed above, however, the Government has not adduced sufficient evidence to support and flesh out in the requisite detail the manner in which Mr. Looby derived KB's prices from the annual budgets. Moreover, even if the Government had spelled out in detail how Mr. Looby used budgets to set prices, the Government points to no evidence to demonstrate that the normal pricing practices of the garment assembly industry are consistent with what Mr. Looby did here.

In its reply brief, the Government does assert that Mr. Looby testified that "normal pricing practices for the garment industry involve the preparation and consideration of budgets that project costs and output for a given time period, with some amount of profit built in once the company is a mature facility." Def.'s Reply Brief at 12. To the same effect, the Government elsewhere claims that Mr. Looby testified that it is normal industry practice to set prices "based upon detailed budgets . . . with the expectation of a profit once [a facility] mature[s] beyond the start-up phase." Def.'s Supp. Reply Brief at 7. It is telling, however, that the Government proffers no citations to the record to support those assertions. Scrutiny of both Mr. Looby's affidavit and his deposition reveals that he never made any such statements.[40] In any event, testimony to such broad effect – referring, for

---

[40]The only even arguably supporting evidence that is cited in the Government's briefs is a reference to Mr. Looby's testimony that "pricing by a facility such as X-Cell [the Dominican garment assembly contractor] in a 'perfect world' would be based upon a budget that considers the factory's potential output and expenses (*e.g.*, the support staff needed for the expected output, overhead expenses, electricity, direct labor, etc.)." *See* Def.'s Brief at 5 (citing and characterizing Looby Deposition at 134-35). However, particularly when read in context, the actual cited testimony does not even profess to describe pricing practices in the garment assembly industry as a whole. Moreover, the testimony is much too basic and lacking in specificity to serve as the

example, to "*a profit*" or to "*some amount* of profit," as well as to the (unquantified) time needed

to allow a plant to become "a *mature* facility" – would be much too simplistic and lacking in detail

to constitute the requisite proof of normal pricing practices in the industry.

As such, just as the Government has failed to compile the evidence needed to properly

substantiate its position that Mr. Looby set KB's prices based on budgets that projected some margin

of profit, the Government has similarly failed to elicit the requisite evidence to establish that such

a procedure is consistent with normal pricing practices in the garment assembly industry.

The Government cites some other evidence that relates to the pricing practices of entities

other than KB. But that evidence also fails to carry the day.

For example, in several places the Government refers to Mr. Looby's testimony that

"everyone [he] ha[s] ever worked with" has "assessed their 'cost per standard allowed minute

[SAM],' and [done] an analysis on the particular product to come up with a target price." *See* Def.'s

Brief at 4 (citing and quoting Looby Deposition at 112-14); *see also* Def.'s Reply Brief at 11

(asserting that "Mr. Looby testified that 'everybody' he has ever worked with has based their prices

---

required evidence of industry practice. Instead, the testimony is more in the vein of a primer for a
layperson – an introduction to some very elementary pricing principles, set forth in somewhat
abstract and theoretical terms (as reinforced by Mr. Looby's use of the qualifier "in [a] perfect
world"). Further, notwithstanding the Government's reference to "a facility *such as* X-Cell," a
review of the transcript reveals that the cited testimony referred specifically (and only) to X-Cell.
*See* Looby Deposition at 133 (confirming that Looby is "talking about X-Cell" in particular). And
even as to X-Cell, Mr. Looby candidly conceded that he has no direct, personal knowledge of that
company's pricing practices. *See id*. at 114 (stating that X-Cell "never told [him] how they [set
prices]").

Significantly, in the course of his deposition, the Government sought to press Mr. Looby as
to whether the pricing practices that he described were standard in the industry. Mr. Looby
demurred: "I mean, how would I know?" *See* Looby Deposition at 174.

on anticipated costs," citing Looby Deposition at 114).[41]  Once again, however, such testimony is

much too general to serve as proof of normal pricing practices in the garment assembly industry.

In addition, the testimony is limited on its face to "everyone [*Mr. Looby*] has ever worked with."

The testimony thus does not even purport to be a considered attestation concerning pricing practices

in the garment assembly industry as a whole.[42]  Further, the testimony refers to setting a "target

price" for each individual "particular product."  But nowhere does the Government explain how that

_____

[41]"Standard Allowed Minute" ("SAM") is a unit of measurement used in industrial engineering to quantify the labor effort exerted in completing a specific task.  Generally speaking, the number of standard allowed minutes is the amount of time that it takes an average worker, expending average effort and using average skills, to complete a particular operation (or here, for example, to assemble some particular garment).  *See generally* Looby Deposition at 149-50; Looby Affidavit ¶ 31; Michael Armstrong, A Handbook of Management Techniques 725 (3d ed. 2001).

[42]More generally, it is far from clear that Mr. Looby is competent and qualified to testify to normal pricing practices in the garment assembly industry.  As noted above, he personally disclaimed the necessary knowledge.  *See* n.40, *supra*.

As a representative of Macclenny/BCG (which is, in this context, a buyer), Mr. Looby is by no means necessarily privy to the details of how any particular garment assembly firms (*i.e.*, sellers) set their prices, much less the normal pricing practices of the garment assembly industry as a whole. *See*, *e.g.*, Looby Deposition at 114 (acknowledging that he lacks any personal, first-hand knowledge as to how X-Cell – the Dominican garment assembly contractor – set its prices).  Moreover, according to his deposition, Mr. Looby has "only worked three places in [his] life," including one firm prior to his employment at BCG (and its predecessor) and the firm where he was employed at the time of his deposition.  *See id*. at 138; Looby Affidavit ¶¶ 1-4.  There is no indication in the record that either Mr. Looby's first employer or his employer at the time of his deposition were garment assembly companies.  Indeed, the evidence suggests that they were not.  *See*, *e.g.*, Looby Deposition at 136 (stating that "[t]he company that [Mr. Looby] was with for [his] first 21 years really made everything themselves"); *id*. at 16, 21 (describing the businesses of Looby's employers); Looby Affidavit ¶¶ 2, 4 (same).  But even assuming *arguendo* that both were garment assembly companies, and assuming that Mr. Looby had knowledge of their pricing practices, that knowledge would either significantly pre-date or post-date the dates of the entries at issue here, and thus could hardly be deemed contemporaneous.  *See id*. ¶¶ 1, 3-4 (indicating that Looby worked for his first employer from 1990-1991, and that his post-BCG employment began in 2007).  Even more to the point, it is doubtful that evidence concerning the pricing practices of only two garment assembly companies could suffice to prove industry-wide practice.

concept relates to the Government's central thesis – that prices are based on annual budgets, discussed above.[43]

Finally, the Government also spends a page or so summarizing certain testimony by Mr. Looby concerning the pricing practices of X-Cell, Macclenny/BCG's Dominican garment assembly contractor.  *See generally* Def.'s Brief at 4-5 (asserting, *inter alia*, that "the prices [that X-Cell] charged to Macclenny [were] determined by the labor costs and depended upon the construction requirements," citing and characterizing Looby Deposition at 112-14; also citing Looby Deposition at 116-23, 130-35).[44]  But, by definition, that testimony concerns X-Cell, not the garment assembly industry in general.[45]  Further, the testimony is much too conceptual and is lacking in specificity and detail.  Significantly, among other deficiencies, the testimony omits any discussion of profit margins.  Accordingly, like the other evidence outlined above, Mr. Looby's testimony concerning X-Cell's pricing practices too cannot constitute the proof of the normal pricing practices of the garment assembly industry that is required to make the Government's case.

Customs has spoken clearly on this matter:  To prove that transaction value is acceptable

---

[43]Similarly, Mr. Looby testified that it was "not uncommon" for X-Cell, the Dominican garment assembly contractor, to be called upon to set a price for a particular item during the course of a season.  *See* Looby Deposition at 131-32.  The Government makes no attempt to square that testimony with its position that, industry-wide, garment assembly firms set prices based on annual budgets.

[44]*See also*, *e.g.*, Def.'s Brief at 16 (asserting that Macclenny/BCG "sometimes dictated prices to X-Cell"); *id.* at 20 (asserting that X-Cell's prices were "based upon an expectation that the seller would cover its expenses and realize some level of profit"); *id.* at 26 (referring to the manner in which "prices [were] set . . . between X-Cell and Macclenny"); Def.'s Reply Brief at 7 (asserting that "the prices charged by . . . X-Cell[] depended upon construction requirements").

[45]As noted above, Mr. Looby candidly acknowledged that he has no personal knowledge of X-Cell's pricing practices.  *See*, *e.g.*, Looby Deposition at 114.

because prices were settled in accordance with normal industry pricing practices, "*objective evidence* of the normal pricing practices of the industry in question is required," together with "a *thorough explanation* of the circumstances surrounding the sale" and "an explanation of why . . . such circumstances establish that the relationship did not influence the price."  *See* Customs Guidance on Acceptability of Transaction Value in Related Party Transactions at 7-8, 10 (emphases added); *see also id*. at 10 (explaining that circumstances of sale claims are rejected when "the allegations are conclusory and not supported by evidence").

Much as the record here includes too little evidence documenting how KB's prices were set, so too the record includes essentially no evidence ("objective" or otherwise)[46] and little explanation

---

[46]Macclenny zeroes in on the language in the Customs publication stating that "*objective evidence* of the normal pricing practices of the industry in question is required" where a party's claim that transaction value is acceptable is based on consistency with normal industry pricing practices.  *See* Customs Guidance on Acceptability of Transaction Value in Related Party Transactions at 7-8 (emphasis added); Pl.'s Supp. Reply Brief at 2-3.  Criticizing the Government's evidence here as "subjective," Macclenny pointedly observes that – "[a]s the only illustration of objective evidence" – the Customs publication cites a Headquarters Ruling Letter in which the agency accepted as the requisite "objective evidence" of normal industry pricing practices proof that the price in question "was defined with reference to prices published in a trade journal (the posted price) and other buyers and sellers commonly used the posted price as the basis of contract prices." *See* Customs Guidance on Acceptability of Transaction Value in Related Party Transactions at 8 (discussing HQ 542261 (March 11, 1981)); Pl.'s Supp. Reply Brief at 2; *see also* Pl.'s Supp. Brief at 3 (discussing HQ 542261, suggesting that the "normal industry pricing practices" test "could be satisfied, for example, if there is an industry or company practice of setting contract prices by reference to a 'posted price' reflecting the prevailing market price for a commodity, as compiled and published by a trade [group]," and citing U.C.C. § 2-305(1)(c) (2013) (referring to "contracts in which 'the price is . . . fixed in terms of some agreed market or other standard as set or recorded by a third person or agency . . . .'")).

Macclenny contends that the Government cannot possibly prevail on its "normal industry pricing practices" theory because "the price between KB and Macclenny was not set in terms of any agreed market price, posted price, or other independent standard that could objectively show that [the] relationship [between the buyer and the seller] d[id] not influence the price."  *See* Pl.'s Supp. Brief at 5; *see also* Def.'s Supp. Reply Brief at 7 (conceding that evidence does not show that KB's

("thorough" or not) of the "normal pricing practices" of the garment assembly industry.  Certainly

the Government has not established that KB's prices were set in accordance with the industry's

normal pricing practices, as Interpretative Note 2 would require.  *See* 19 C.F.R. § 152.103(l)(1)(ii).

Customs has underscored that appraisement based on transaction value is not permitted in

a related party transaction absent "sufficient information" to demonstrate satisfaction of either the

circumstances of the sale test or the test values.  *See* Customs Guidance on Acceptability of

Transaction Value in Related Party Transactions at 17.  The evidence that the Government has

marshaled to date is decidedly insufficient to support the use of transaction value here.  On both the

facts and the law, the Government's motion for summary judgment sustaining Customs' use of

transaction value therefore must be denied.[47]

---

prices "related to any 'agreed market price' or 'posted price'").  The Government "do[es] not dispute
that the 'posted' market price described in [HQ 542261] provided an acceptable means of
determining that the price paid was consistent with normal pricing practices in the industry."  *See
id*. at 6.  But, on the other hand, the Government maintains that such "'posted prices' are not the only
means by which [Interpretative Note 2's 'normal industry pricing practices' test] can be satisfied."
*Id.*  And the Government further argues that KB's prices in fact were "set by an independent
standard," in a manner "consistent with normal pricing practices" in the industry.  *Id.*  The denial
of the Government's motion for summary judgment on the grounds set forth above obviates any
need to give further consideration to the parties' arguments on this point at this time.

[47]Besides seeking summary judgment sustaining Customs' use of transaction value to
appraise the merchandise, the Government also requests the entry of summary judgment on its
counterclaim for additional duties reflecting certain costs that were not included at the time the
entries at issue were liquidated.  *See* Def.'s Brief at 9, 20-26, 29; Def.'s Reply Brief at 12-15, 20-21;
Def.'s Supp. Brief at 10.  Because the Government's counterclaim is contingent on a determination
sustaining the use of transaction value, summary judgment as to the counterclaim also must be
denied.

## B.  Macclenny's Motion for Summary Judgment

Macclenny's motion for summary judgment is similarly lacking in merit.  Macclenny seeks summary judgment on its claim that all entries at issue should have been appraised based on deductive value, with the exception of the three entries which are entitled to duty-free treatment under the CBTPA.  *See generally* Pl.'s Brief at 2, 13-15, 17-25, 28-31, 32; Pl.'s Reply Brief at 1-11, 17-18; Pl.'s Supp. Brief at 1-10; Pl.'s Supp. Reply Brief at 1-4; section III.A.1.c, *supra* (granting Government's motion for summary judgment as to three entries entitled to duty-free treatment under the CBTPA).

However, the valuation statute permits Customs to appraise merchandise based on deductive value only if transaction value cannot be used.  *See* 19 U.S.C. § 1401a(a); section I, *supra*.  The statute thus requires the use of transaction value even where (as here) the buyer and the seller are related, provided that "the circumstances of the sale . . . indicate[] that the relationship . . . did not influence the price" or, alternatively, that the transaction value "closely approximates" either of the two test values set forth in the statute – that is, that the transaction value closely approximates either (i) the transaction value of identical or similar merchandise in sales to unrelated buyers in the U.S. or (ii) the deductive value or the computed value for identical or similar merchandise.  *See* 19 U.S.C. § 1401a(b)(2)(B)(i)-(ii).[48]

As detailed above, the Government thus far has failed to justify the use of transaction value based on the "circumstances of the sale."  Whether or not it is possible for the Government to do so

---

[48]The statute further requires that the test value used for comparison "relate[] to merchandise that was exported to the United States at or about the same time" as the merchandise at issue.  *See* 19 U.S.C. § 1401a(b)(2)(B).

remains an open question.  *See* section III.A.2, *supra*.  But, in any event, quite apart from the

"circumstances of the sale" test, neither party has yet sought to make a showing as to whether or not

the transaction value closely approximates the deductive value or the computed value for identical

or similar merchandise – the second of the two "test values" set forth in the statute.  *See* 19 U.S.C.

§ 1401a(b)(2)(B)(ii); *see generally* Def.'s Brief at 26-27 (emphasizing that, even if "circumstances

of the sale" test is not satisfied, statutory test values must be considered before determination can

be made concerning appraisement using transaction value); Def.'s Reply Brief at 16-17 (same).[49]

Macclenny attempts to argue that, by seeking summary judgment based solely on the

circumstances of the sale test, the Government has waived the opportunity to seek to make a case

for the use of transaction value based on the statutory test values.  *See* Pl.'s Brief at 29 (noting that

Government "has not offered any proof to establish a test value acceptable as deductive value or

under computed value," and asserting that "[i]f the [Government] seeks to show the accepta[bility]

of a transaction value because the appraised values closely approximate test values . . . , then it was

[the Government's] burden to offer evidence accordingly").  However, Macclenny cites no authority

---

[49]As explained above, at the relevant time, KB was the only seller in Nicaragua of the type of merchandise at issue here, and KB did not sell to unrelated buyers.  *See* section I, *supra*.  Thus, there are no sales of "identical or similar merchandise" to "unrelated buyers in the United States" to serve as a basis for comparison for purposes of the first test value set forth in the statute.  *See* 19 U.S.C. § 1401a(b)(2)(B)(i).  The parties therefore agree that the only relevant test value here is the second one – *i.e.*, whether the transaction value closely approximates the deductive value or the computed value for identical or similar merchandise.  *See* 19 U.S.C. § 1401a(b)(2)(B)(ii); Def.'s Brief at 27 (explaining that, in light of facts of this case, "the test set forth in '(i)' cannot be applied"); Pl.'s Brief at 23 n.11 (noting that first statutory test value is not applicable, "because the record shows that KB was the only producer of men's tailored clothing in Nicaragua . . . all of which was shipped to Macclenny"); Pl.'s Reply Brief at 13-14 (explaining that "there were no sales of identical or similar merchandise made to unrelated U.S. buyers upon which a transaction value of identical or similar merchandise may be predicated").

to support this novel application of the doctrine of waiver.  Nor can Macclenny do so.  The Government was under no obligation to address both the circumstances of the sale test and the test values in its motion for summary judgment.  *See generally*, *e.g.*, 11 Moore's Federal Practice § 56.122, pp. 56-307-56-310 (discussing "Partial Summary Judgments," and explaining, *inter alia*, that "summary judgment may be requested not only as to an entire case, or as to a complete claim or defense, but also as to parts of claims or defenses"); *id*. § 56.121[1][a], pp. 56-299-56-300 (captioned "Multiple [Summary Judgment] Motions on Different Grounds Should Not Be Disfavored").[50]

The bottom line is that – unless and until it has been determined that the use of transaction value is not mandated by either the circumstances of the sale test or the statutory test values – the statute simply does not permit appraisement based on deductive value, which is the result that Macclenny advocates.  Macclenny's motion for summary judgment therefore must be denied.

## IV.  Conclusion

For the reasons set forth above, the Government's motion to dismiss for lack of jurisdiction Macclenny's claim under the United States-Caribbean Basin Trade Partnership Act ("CBTPA") as to all entries other than those covered by Protest No. 1803-04-100056 must be granted.  The Government's motion seeking dismissal or denial of Macclenny's CBTPA claim with respect to the

---

[50]Macclenny devotes most of its ink on the test values issue to arguing that a remand to Customs is not appropriate.  *See*, *e.g.*, Pl.'s Brief at 13-14, 15, 18 n.8, 22-25, 32; Pl.'s Reply Brief at 12-14.  Macclenny thus focuses on a narrow question of procedure, and tries to gloss over the critical underlying point of substantive law – specifically, Customs' statutory obligation to appraise merchandise based on its transaction value, even where the buyer and the seller are related, if either of the two tests set forth in 19 U.S.C. § 1401a(b)(2)(B) is satisfied.

four entries covered by Protest No. 1803-04-100056 which were made before October 2, 2000

similarly must be granted.  As to the three specified entries that are subject to the CBTPA (Entry

Nos. WJP-0002470-8, WJP-0002492-2, and WJP-0002507-7), the Government's motion for

summary judgment must be granted.  On the other hand, both the Government's motion for summary

judgment concerning the proper method of appraisement of all remaining entries and Macclenny's

cross-motion for summary judgment on the same issue must be denied.

An order will enter accordingly.


/s/ Delissa Ridgway
Delissa A. Ridgway
Judge


Dated:  January 22, 2014
New York, New York